## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TOWNSENDS, INC., *et al.*,[1] | ) | Case No. 10-14092 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Pending) |
| | ) | |
| | ) | |

## DECLARATION OF GEORGE C. WHITE IN SUPPORT OF FIRST DAY MOTIONS

I, George C. White, hereby state and declare as follows:

1.      I am the Chief Financial Officer of Townsends, Inc. ("Townsends") and its affiliated debtors in the above-captioned chapter 11 cases, as the debtors and debtors in possession (collectively, the "Debtors" or the "Company").  In connection with my duties for the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs and books and records.

2.      On December 19, 2010, (the "Petition Date"), the Debtors commenced their respective bankruptcy cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the  District of Delaware.

3.      To enable the Debtors to minimize any adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors intend to request various types of relief in certain "first day" applications and motions (collectively, the "First Day Relief").  The First Day Relief seeks, among other things, to: (a) maintain employee morale and

---

[1]      The Debtors, followed by the last four digits of their respective taxpayer identification numbers, are as follows: Townsends, Inc. (0681); Townsend Farms, Inc. (5263); Townsends of Arkansas, Inc. (5644); Townsend Farms of Arkansas, Inc. (0027); and Crestwood Farms LLC (7388) c/o 22855 DuPont Boulevard, Georgetown, DE 19947.

confidence; (b) preserve customer and vendor relationships; (c) ensure the continuation of the Debtors' cash management system and other business operations without interruption; and (d) establish certain other administrative procedures to promote a smooth transition into chapter 11. Gaining and maintaining the support of the Debtors' employees, customers, vendors and other key constituencies, as well as maintaining the day-to-day operations of the Debtors' business with minimal disruption, will be critical to the Debtors' efforts during these chapter 11 cases.

4. I submit this Declaration in support of the First Day Relief. Any capitalized terms not expressly defined herein have the meanings set forth in the applicable motion or application. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition and/or information provided to me by the Debtors' employees. If I were called upon to testify, I could and would testify to each of the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

5. Part I of this Declaration describes the Debtors' business. Part II summarizes the Debtors' debt structure. Part III explains certain of the material events that led the Debtors to seek protection under chapter 11 of the Bankruptcy Code. Part IV sets forth relevant facts in support of the First Day Relief.

## I.      THE DEBTORS' BUSINESS

### A.      Overview

6. Founded in 1891, the Debtors are a third-generation, family-owned poultry company. The Debtors are leading producers and marketers of quality, value added poultry products to the foodservice and retail grocery markets throughout the world.

7.    Townsends is a Delaware Corporation that is headquartered in Georgetown, Delaware, and operates, directly or through its four wholly-owned subsidiaries, production and processing facilities in Arkansas and North Carolina. They maintain offices and a culinary innovation operation in Atlanta, Georgia.

8.    Through vertical integration, the Debtors manage breed stock egg production, hatching and the growing of chickens including both breed stock and broiler chickens. The Debtors also manage the feed manufacturing, growing, processing, packaging and distribution functions to support their operations.

9.    The Debtors own three processing plants in North Carolina and one processing plant in Arkansas. The breeding and hatching operations in Arkansas and North Carolina have a set capacity of 1.3 million eggs per week. The Debtors produce approximately 700 million pounds of poultry annually. The Debtors also have approximately 950,000 tons of annual finished feed capacity in their feed milling operations to support their live chicken operations. In addition, the Debtors have an innovation center located in Atlanta, Georgia, which specializes in creating distinctive products and adapt quickly to consumer trends while working hand-in-hand with key foodservice customers to achieve their specific poultry product objectives.

10.    The Debtors contract with more than 300 growers with over 1,200 chicken houses. Many of the growers are small farm owners, who either raise and care for the chickens the Debtors use for breeding or who grow the broiler chickens from hatchlings until they are ready to be processed. The Debtors maintain title to and ownership of the chickens and feed ingredients fed to them, but the Debtors contract with growers to administer feed and tend to the chickens used for breeding and for the broiler chickens until they reach certain targeted weights.

The growers are independent contractors. The growers own, operate and provide the farms, the chicken houses, equipment, utilities and labor necessary to tend the chickens. Once the broiler chickens have reached a certain weight and meet other specifications, these chickens are returned to the Debtors to be processed, packaged and transported to customers.

11.     As of December 8, 2010, the Debtors had approximately 3017 employees. As of December 5, 2010, the Debtors' unaudited consolidated financial statements reflected $504.2 million of revenue for the prior 12-month period, assets of approximately $131 million and liabilities of approximately $127 million.

## II.     THE DEBTORS' DEBT STRUCTURE

### A.     Existing Indebtedness

### (i)     Loan and Security Agreement.

12.     The Debtors are a party to that certain Loan and Security Agreement dated as of April 25, 2007 (as amended from time to time, the "Loan Agreement"), by and among the Debtors, Wilmington Trust Company (individually and in its capacity as administrative and collateral agent for the Bank Group (as defined below), "WTC"), Greenstone Farm Credit Services, ACA/FLCA ("Greenstone"), Agstar Financial Services, PCA ("Agstar"), and PNC Bank, N.A. (as successor to Mercantile Peninsula Bank, "PNC" each a lender and collectively with WTC, Greenstone and Agstar, the "Bank Group"). Pursuant to the Loan Agreement, the Bank Group made available to the Debtors a revolving line of credit (the "Revolver") to be used for business operations and certain term loan facilities (collectively, the "Term Loan") the proceeds of which were used to refinance then existing indebtedness and to back certain letters of credit.

13.     As of the Petition Date, the aggregate outstanding principal and accrued interest under the Loan Agreement is approximately $20.7 million (plus $12,085,417.00 in

commitments with respect to letters of credit) with regard to the Term Loan and approximately $40.0 million with regard to the Revolver.

14. To secure the Revolver and the Term Loan, the Debtors granted the Bank Group a first priority liens, mortgages and security interests in substantially all of the Debtors' assets, including without limitation, accounts, raw materials, farm products, receivables, real property, rents and personal property.

**(ii)** **Amended and Restated Note Purchase Agreement.**

15. Additionally the Debtors are a party to that certain Amended and Restated Note Purchase Agreement dated as of June 13, 2005 (as amended, the "Note Purchase Agreement"), by and among the Debtors, John Hancock Life Insurance Company (U.S.A.) (as successor by merger to John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company), John Hancock Insurance Company of Vermont and John Hancock Life & Health Insurance Company (formerly known as Manulife Insurance Company, collectively with the other John Hancock parties, the "Noteholders"), as amended from time to time. Under the Note Purchase Agreement, the Debtors issued 8.44% notes due June 1, 2013 (the "Notes") to the Noteholders.

16. As of the Petition Date, the aggregate principal and accrued interest under the Note Purchase Agreement was approximately $8.3 million.

17. To secure the indebtedness under the Notes, the Debtors granted the Noteholders liens on and security interest in substantially all of the Debtors' assets.

**(iii)** **Intercreditor Agreement**

18. Pursuant to that certain Intercreditor and Collateral Agency Agreement dated April 25, 2007 (the "Intercreditor Agreement"), by and among John Hancock Life Insurance Company (U.S.A.) (as collateral agent for the Noteholders under the Note Purchase

Agreement), the Noteholders, WTC (as administrative and collateral agent for the Bank Group under the Loan Agreement and as collateral agent for the Bank Group and the Noteholders under the Intercreditor Agreement), and the Bank Group, certain collateral of the Debtors is secured on a *pari passu* basis for the benefit of the Bank Group and the Noteholders.

        **(iv)**      **Forbearance**

        19.      On or about November 30, 2008, the Debtors advised the Bank Group that the Debtors had failed to comply with certain financial covenants under the Loan Agreement and the Debtors requested the Bank Group, and the Bank Group agreed, to, among other things, forbear from exercising the Bank Group's rights and remedies under the Loan Agreement through and including December 31, 2008 (as extended, the "Forbearance Period") pursuant to the terms and conditions of that certain Forbearance and Amendment to Loan Documents Agreement dated as of November 30, 2008 (as amended, the "Forbearance Agreement"), by and among the Debtors and the Bank Group, and acknowledged by the Noteholders. The Bank Group agreed to extend the Forbearance Period through and including February 28, 2009 pursuant to the terms and conditions of that certain First Amendment to the Forbearance Agreement dated as of December 31, 2008. The Bank Group agreed to extend the Forbearance Period through and including April 30, 2009 pursuant to the terms and conditions of that certain Second Amendment to the Forbearance Agreement dated as of February 28, 2009.

        20.      On or about April 30, 2009, the Debtors notified the Noteholders that the Debtors had failed to comply with certain financial covenants under the Note Purchase Agreement and the Debtors requested the Noteholders to, among other things, forbear from exercising their rights and remedies under the Note Purchase Agreement. The Bank Group agreed to extend the Forbearance Period, and the Noteholders agreed to forbear from exercising their rights and remedies under the Note Purchase Agreement, through and including April 25,

2010 pursuant to the terms and conditions of that certain Third Amendment to the Forbearance Agreement dated as of April 30, 2009. The Bank Group and the Noteholders agreed to extend the Forbearance Period through and including October 25, 2010 pursuant to the terms and conditions of that certain Fourth Amendment to the Forbearance Agreement dated as of April 25, 2010 (the "Fourth Amendment"). The Bank Group agreed to extend the Forbearance Period through and including 12:00 noon (Eastern Time) on the Petition Date pursuant to the terms and conditions of certain modifications to the Fourth Amendment. The Noteholders agreed to extend the Forbearance Period through and including 12:00 noon (Eastern Time) November 19, 2010 pursuant to the terms and conditions of certain modifications to the Fourth Amendment but have not extended beyond this time period.

21.     As a condition to entering into the Fourth Amendment, the Bank Group and the Noteholders required The Indian River Trust, the sole shareholder of Townsends, to pledge its interest in Townsends pursuant to the terms and conditions of that certain Non-Recourse Guaranty, Pledge and Security Agreement dated as of April 25, 2010, by and between The Indian River Trust and WTC (in its capacity as collateral agent for the Bank Group and the Noteholders under the Intercreditor Agreement). In addition, as a condition to entering into the Fourth Amendment, the Bank Group and the Noteholders required Townsends to pledge its interest in Townsend Farms, Inc., Townsends of Arkansas, Inc. and Crestwood Farms LLC pursuant to the terms and conditions of that certain Pledge and Security Agreement dated as of April 25, 2010, by and between Townsends and WTC (in its capacity as collateral agent for the Bank Group and the Noteholders under the Intercreditor Agreement). Further, as a condition to entering into the Fourth Amendment, the Bank Group and the Noteholders required Townsends of Arkansas, Inc. to pledge its interest in Townsend Farms of Arkansas, Inc. pursuant to that

certain Pledge and Security Agreement dated as of April 25, 2010, by and between Townsends of Arkansas, Inc. and WTC (in its capacity as collateral agent for the Bank Group and the Noteholders under the Intercreditor Agreement).

     (v)     **Industrial Revenue Bonds and Letters of Credit.**

22.     The Chatham County Industrial Facilities and Pollution Control Financing Authority ("The Chatham County Authority") issued certain industrial revenue bonds on September 1, 2001 (the "Chatham County Revenue Bonds"), the proceeds of which were made available to Townsends to fund construction of certain facilities in Chatham County, North Carolina pursuant to the terms and conditions of that certain Loan Agreement dated September 1, 2001 (the "Chatham County Loan Agreement"), by and between Townsends and The Chatham County Authority.

23.     As of the Petition Date, the aggregate principal and accrued interest under the Chatham County Loan Agreement is approximately $2.9 million.

24.     WTC issued an Irrevocable Letter of Credit dated September 19, 2001 (as amended, the "Chatham County Letter of Credit") in the amount of $2,960,417 to U.S. Bank (as successor trustee to First Union National Bank under the Chatham County Revenue Bonds trust indenture) for the account of Townsends, to back Townsends' obligations under the Chatham County Loan Agreement. Drawings under the Chatham County Letter of Credit are backed by a term loan facility under the Loan Agreement.

25.     Independence County, Arkansas ("Independence County") issued certain industrial revenue bonds on November 1, 1996 (the "Independence County Revenue Bonds"), the proceeds of which were used by Independence County to purchase certain facilities in Independence County, Arkansas and to lease such facilities to Townsends of Arkansas, Inc. pursuant to the terms and conditions of that certain Lease Agreement dated as of November 1,

1996 (the "Independence County Lease Agreement"), by and between Townsends of Arkansas, Inc. and Independence County.

26.     As of the Petition Date, the aggregate principal and accrued interest under the Independence County Lease Agreement is approximately $9.2 million.

27.     WTC issued an Irrevocable Letter of Credit dated April 25, 2007 (as amended, the "Independence County Letter of Credit") in the amount of $9,125,000 to U.S. Bank (as trustee under the Independence County Revenue Bonds trust indenture) for the account of Townsends of Arkansas, Inc. to back Townsends of Arkansas, Inc.'s obligations under the Independence County Lease Agreement.  The Independence County Letter of Credit is backed by a term loan facility under the Loan Agreement.

### (vi)     Accounts Payable and Accrued Expenses

28.     As of the Petition Date, the Debtors have trade accounts payable and other accrued expenses in the approximate amount of $21.7 million.

### (vii)     Pension Liability

29.     As of the Petition Date, the Debtors have unfunded defined benefit pension liability in the approximate amount of $9.9 million.

## III.     EVENTS LEADING TO THE CHAPTER 11 FILING

### A.     Negative Events of 2008

30.     Several factors have led to the commencement of these chapter 11 cases. The  primary factor is that in 2008, the cost of feed ingredients used by the Debtors in their business increased to record amounts, while the price of poultry products decreased significantly due to the historic economic downturn and oversupply in the industry.  This combination of high input costs and lower revenues resulted in a significant loss for the Debtors.

31.     Profitability in the poultry industry is materially affected by the commodity prices of feed ingredients.  The cost of corn and soybeans, the Debtors' primary feed ingredients, increased significantly in early 2008 as a result of, among other things, increasing demand for these products because of the passage of the Energy Independence and Security Act of 2007 (the "EISA").  The EISA requires a gradual increase in the production of biofuels, including ethanol (which is made from corn), from nine billion gallons in 2008 to 36 billion gallons by 2022.  As a result, following passage of the EISA, the demand for, and price of, corn increased significantly.  The price of corn has historically been between $2 and $3 per bushel, but rose as high as $7.65 per bushel in June 2008. This resulted in significantly higher feed expenses for the Debtors.

32.     The historic recession in the United States had a significant impact on the poultry industry in 2008.  Demand for poultry products, including the Debtors' products, declined considerably resulting in lower product pricing.  Further limiting the pricing of poultry products was the resulting oversupply in the industry.

33.     These two factors, high feed costs coupled with declining product pricing, led to the financial decline of several poultry processing companies, including the bankruptcy of one of the largest poultry processing companies in the United States, Pilgrim's Pride Corporation.

34.     As a result of these factors, the Debtors incurred a loss of approximately $48.9 million in 2008.

## B.     Leverage Issues

35.     As a result of the sizeable loss incurred by the Debtors in 2008, the Debtors were forced to draw on a majority of the Revolver.  As a result, the Debtors became substantially overleveraged relative to their size and industry norms.   In addition, the Debtors'

leveraged position resulted in certain covenant defaults under the Loan Agreement with the Bank Group and the Note Purchase Agreement with the Noteholders. While the Bank Group and the Noteholders agreed to forbear as described above, the Debtors were required to pay certain fees and expenses and the interest rates applicable to such indebtedness were increased. All of this has increased the Debtors' outstanding indebtedness beyond a manageable level.

## C.    Restructuring Alternatives

36.    The Debtors have investigated and considered various out-of-court restructuring alternatives. The Debtors originally retained SSG Capital Advisors, LLC ("SSG") in late 2008 to explore certain refinancing and sale opportunities with third parties. SSG was temporarily put in hold in 2009 and early 2010 as the Debtors considered other options, but SSG was reengaged in March 2010 with a renewed focus of identifying refinancing and sale opportunities for the Debtors. Despite numerous discussions, management meetings and negotiations with many third parties, because of various factors, no viable out-of-court restructuring alternative has materialized.

## D.    Business Improvements

37.    Beginning with the appointment of a new management team with extensive poultry operations and food industry leadership experience in February 2010, the Debtors have taken proactive steps to better position their business in the poultry industry. Among other things, the Debtors have taken steps to increase operational efficiencies and reduce costs, improve product quality, solidify and diversify the customer base and reduce leverage. As a result of this renewed focus, the Debtors' financial position began to improve in mid-2010.

## E.    Exhaustion of Revolving Line of Credit and Bankruptcy Filing

38.    Despite significant improvements implemented by the new management team in 2010, as a result of increased feed costs in mid- to late 2010, the Debtors again were

forced to further draw down on the revolving line of credit made available by the Bank Group under the Loan Agreement. The Debtors recognized that they would reach the limits on the revolving line of credit in December 2010 and, because the Bank Group declined to increase the available credit limit or provide the Debtors with overadvances outside a bankruptcy proceeding, the Debtors determined that a bankruptcy filing was necessary for the Debtors to continue to operate while exploring their strategic options.

39.     During the chapter 11 process, the Debtors intend to continue normal operations as they explore strategic alternatives for the benefit of their creditors and all other parties in interest.

## IV.     FIRST DAY RELIEF

40.     An important element to the success of the Debtors' chapter 11 cases is approval of each of the Debtors' requests for First Day Relief submitted concurrently herewith. Generally, the First Day Relief has been designed to facilitate: (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of employees, customers, vendors, suppliers and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of these cases. I have reviewed the First Day Relief, including the exhibits thereto and supporting memorandum, and I believe that the relief sought therein is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to maximize the value of their estates for their creditors and other stakeholders.

**A.** **Debtors' Motion For Joint Administration Of Chapter 11 Cases Pursuant To Rule 1015(B) Of The Federal Rules Of Bankruptcy Procedure And Local Bankruptcy Rule 1015-1**

41.     By this Motion,[2] the Debtors are seeking the entry of an order directing joint administration of the Debtors' related chapter 11 cases and related relief.

42.     Given the integrated nature of the Debtors' operations, joint administration of the chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings and orders that will arise in the chapter 11 cases will affect each and every Debtor.  The entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration also will allow this Court, the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor the chapter 11 cases with greater ease.

43.     Further, joint administration will not adversely affect the Debtors' respective constituencies because this Motion requests only administrative, not substantive, consolidation of the Debtors' estates.  Parties in interest will not be harmed by the relief requested but, instead, will benefit from the cost reductions associated with the joint administration of the chapter 11 cases.

44.     I believe that joint administration of the Debtors' Chapter 11 Cases is in the best interests of the Debtors, their estates, and all parties in interest.

---

[2]     Capitalized terms used, but not otherwise defined herein, shall have those meanings ascribed to them in the relevant Motion.

**B.    Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. § 341 And 28 U.S.C. § 156(c) Authorizing The Debtors To File (A) Consolidated List Of Creditors And (B) Consolidated List Of Debtors' Top Thirty Creditors**

45.    By this Motion, the Debtors are requesting authority to file (i) a consolidated list of creditors and (ii) a consolidated list of the Debtors' thirty (30) largest unsecured creditors.

46.    The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the notices and other documents in these cases.  The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the notices and other similar documents.  The Debtors also submit that a single consolidated list of their combined thirty (30) largest unsecured creditors in these cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each of the Debtors.

**C.    Debtors' Motion For Entry Of An Order Pursuant To 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f) And Local Bankruptcy Rule 2002-1(f) Authorizing The Retention Of  Donlin, Recano & Company, Inc. As Claims, Noticing, And Balloting Agent To The Debtors And Debtors-In-Possession**

47.    By this Motion, the Debtors respectfully request the entry of an order authorizing them to retain and employ Donlin Recano as Claims, Noticing and Balloting Agent in these chapter 11 cases as of the Petition Date, to, among other things: (a) serve as the Court's noticing agent to mail notices to the estate's creditors and parties in interest, (b) provide computerized claims, objection and balloting database services, and (c) provide expertise, consultation and assistance in claim and ballot processing and other administrative information and (d) provide disbursement services with respect to the Debtor's bankruptcy case, if requested.

48.     Pursuant to Section 156(c),[3] this Court is authorized to use facilities other than the Clerk's Office for the administration of bankruptcy cases, including such matters as giving notice of hearings and orders filed in these chapter 11 cases, the meeting of creditors pursuant to section 341 of the Bankruptcy Code and claims bar dates, and providing record keeping and claims docketing assistance.

49.     In addition, under Bankruptcy Rule 2002(f), the Court may direct that a person other than the Clerk of the Court give notice of the various matters described therein. Moreover, Local Rule 2002-1(f) requires a debtor to file an application to retain a notice and/or claims clerk within ten (10) days of the Petition Date in all cases with more than 200 creditors. The Debtors believe that the number of creditors in these cases will greatly exceed that number. Thus, pursuant to Local Rule 2002-1(f) and for the reasons set forth below, the Debtors believe it is necessary and in the best interests of their creditors and estates to engage Donlin Recano to act as outside agent to the Clerk's Office in order to assume full responsibility for, among other things, distribution of notices and proof of claim forms and the maintenance, secondary processing and docketing of all proofs of claim filed in the Debtors' chapter 11 cases. In addition, in connection with any plan proposed by the Debtors, the Debtors have determined that they will require the services of Donlin Recano to act as solicitation agent with respect to, *inter alia*, the mailing of the Debtors' disclosure statement, the plan and ballots and maintaining and tallying ballots in connection with the voting on such plan.

50.     The Debtors anticipate that there will be hundreds of entities that the Debtors will be required to serve with the various notices, pleadings, and other documents filed

---

[3]     28 U.S.C. § 156(c) provides, in relevant part, that "[a]ny court may utilize facilities or services, either on or off the court's premises, which pertain to the provision of notices, dockets, calendars and other administrative information to parties in cases filed under the provisions of title 11, United States Code, where the cost of such facilities or services are paid for out of the assets of the estate and are not charged to the United States"

in these chapter 11 cases. In consideration of the number of anticipated claimants and other parties-in-interest, the Debtors respectfully submit that the appointment of Donlin Recano will expedite the distribution of notices and relieve the Clerk's Office of the administrative burden of processing such notices.

51.     Donlin Recano is a data processing firm that specializes in claims processing, noticing, balloting, disbursement and other administrative tasks in chapter 11 cases. The Debtors propose to retain Donlin Recano on the terms and conditions set forth in an agreement substantially in the form attached to the Motion as **Exhibit A** and incorporated therein by reference (the "Donlin Recano Agreement").

52.     For all of the foregoing reasons, the I believe that the appointment of Donlin Recano as the Claims, Noticing and Balloting Agent is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

**D.     Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 345(b) And 503(b)(1) And Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use Of Existing (A) Bank Accounts, (B) Cash Management System And (C) Business Forms, Books And Records; (II) Authorizing Continued Intercompany Transactions And Providing Administrative Priority Status To Postpetition Intercompany Claims; And (III) Waiving On An Interim Basis Debtors' Compliance With Investment Guidelines**

53.     By this Motion, the Debtors respectfully request the entry of an order: (a) authorizing the Debtors' continued maintenance and use of (i) the Bank Accounts, (ii) the Cash Management System, including modifications permitted by applicable law thereto upon the entry of an order approving the Debtors' post-petition financing or otherwise, and (iii) the Business Forms, Books and Records; (b) authorizing the Debtors' continued intercompany funding and granting administrative expense status to intercompany obligations; and (c) waiving on an interim basis the Debtors' compliance with the investment guidelines under section 345 of the Bankruptcy Code.

### (i)     The Bank Accounts

54.     The Debtors maintain nine (9) active bank accounts in the ordinary course of business, including, without limitation, concentration, controlled disbursement, lockbox, export collections sweep, and payroll accounts (collectively, the "Bank Accounts"). A list of the Bank Accounts and the banks (the "Banks") at which such Bank Accounts are maintained is attached hereto as **Exhibit A** and incorporated herein by reference. Currently, the Debtors maintain the Bank Accounts with various Banks described herein and in **Exhibit A** attached to the Motion.

55.     The Debtors believe that maintaining and continuing use of the Bank Accounts is essential to a smooth and orderly transition into and operation during these chapter 11 cases. The Debtors' personnel can readily distinguish between prepetition and postpetition obligations and disbursements without closing the Bank Accounts and opening new accounts. To protect against the possible inadvertent payment of prepetition claims, the Debtors will immediately advise their Banks not to honor checks issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtors. Accordingly, the Debtors respectfully request that they be authorized to maintain and use the Bank Accounts in the ordinary course of business, provided that no prepetition checks, drafts, wire transfers, or other forms of tender that have not yet cleared the relevant drawee bank as of the Petition Date will be honored unless authorized by separate order of this Court.

### (ii)     The Cash Management System

56.     As set forth in further detail below, the Debtors maintain a centralized, integrated cash management system (the "Cash Management System") using the Bank Accounts referenced above in the operation of their businesses. The Debtors routinely deposit into and withdraw funds from certain of the Bank Accounts by different methods including by check and

electronic transfer. The Cash Management System allows the Debtors, among other things, to: (a) control, distribute and monitor corporate funds; (b) ensure cash availability; and (c) reduce administrative expenses by facilitating the movement of funds. Further, the Debtors' cash management system facilitates cash monitoring, forecasting, and reporting, and enables the Debtors to maintain control over the administration of their Bank Accounts. The Cash Management System is similar to those utilized by other large companies. The Cash Management System is centralized through Townsends, Inc. and is coordinated through the Debtors' corporate offices in Georgetown, Delaware.

57. The Debtors accurately record all collections, transfers, and disbursements as they are made. The components of the Cash Management System are organized around three principal functions: (i) cash collection, (ii) concentration, and (iii) disbursements. A chart illustrating the general overview of the flow of funds through the Cash Management System attached as **Exhibit B** to the Motion.

58. The Cash Management System allows the Debtors to effectively and efficiently run their businesses. The Debtors believe that to maximize the value of their estates there must be minimal disruption to their administrative affairs, and that the maintenance and modest alteration of the Cash Management System, as provided herein, is essential to limiting disruptions to the Debtors' operations.

**(a)**     <u>**Cash Collections**</u>

59. The Debtors generate and receive funds primarily from sales of chicken and other poultry-related products (the "<u>Payments</u>").

60. The Debtors generally have three collection points for the Payments. A majority of the Payments go into an account maintained at Wachovia / Wells Fargo (the "<u>Lockbox Account</u>"), with certain payments being made directly to the concentration account

(the "Master Concentration Account") maintained at PNC Bank, N.A. (as successor to Mercantile Peninsula Bank, "PNC").

61. The remainder of the Payments are deposited into the US Bank account which handles export collections (the "Export Account").

62. Prior to the Petition Date, on a daily basis, and to the extent necessary and available, the Debtors drew against the Revolver (as defined below) to cover any shortfall between their cash on hand and their daily cash requirements. The resulting Revolver proceeds or other borrowings have been deposited into the Master Concentration Account.

**(b)** **Concentration**

63. Prior to the Petition Date, funds received in the Lockbox Account were available to the company on a next day basis and were manually transferred each day to the Master Concentration Account for use by the Debtor. Similarly, the Export Account was automatically swept daily (to the extent of balances) to the Master Concentration Account net of a minimum balance of $1,000 in the Export Account to cover any miscellaneous bank charges.

64. Prior to the Petition Date, any excess funds in the concentration account were swept to reduce the Revolver balance.

**(c)** **Disbursements**

65. The Debtors disburse funds from a variety of their accounts. Third-party administrators for both the Debtors' health insurance program and workers' compensation program electronically draw payments from the Lockbox Account daily. All other disbursements are funded by the Concentration Account either directly, through the controlled disbursement account maintained at PNC (the "Controlled Disbursement

Account"), or one of the payroll accounts. Generally, most accounts payable are paid by check (typically once weekly) from the Controlled Disbursement Account. Certain payments, including any which must be made by wire, are made directly from the Concentration Account. Finally, payroll for the Debtors' various operations are funded by dedicated payroll accounts.[4]

#### (d)    **Intercompany Payments**

66.    The Debtors' receivables are received into and non-payroll payables are paid from various accounts, each in Townsends, Inc.'s name. While detailed records for each transaction are maintained in the specific Debtors' books and records, the Debtors' financial records are compiled and maintained on a consolidated basis.

#### (e)    **Proposed Post-Petition Changes to Cash Management System**

67.    While excess accumulation of cash were swept daily to pay down the Revolver prior to the Petition Date, the contemplated DIP financing does not require that daily sweep. Moreover, due to current business conditions, the Debtors do not expect to accumulate significant cash in excess of their daily cash needs.

68.    Unfortunately, PNC, where the Debtors have maintained their concentration account and four of their payroll accounts, has informed the Debtors that they do not typically maintain debtor-in-possession accounts for their customers. Accordingly, PNC does not execute collateralization agreements with the Office of the United States Trustee.

---

[4]    Because a large number of the Debtors' hourly employees are paid by check, the Debtors have typically carried daily balances in their various payroll accounts to ensure that fees were available as checks were presented. Unfortunately, while most employees cashed checks promptly, not all employees' checks were presented timely.

69.     As a result, the Debtors are in the process of redirecting certain of their collection activities from the Master Concentration Account to the Lockbox Account at Wachovia.  In addition, the Debtors intend to convert their payroll accounts maintained at PNC to zero balance accounts to which the Debtors can direct funds daily to meet that day's check presentments.  Further, rather than accumulating any excess cash in the Master Concentration Account, the Debtors will manually transfer any excess cash back to the Lockbox Account.  In that way, the Debtors believe that they can keep overnight balances at PNC below the FDIC insurance threshold of $250,000.

70.     The Debtors believe that their post-petition changes in their cash management can be achieved in due course, but may take up to forty-five days to accomplish.

71.     The Cash Management System allows the Debtors to effectively and efficiently run their businesses.  The Debtors believe that to maximize the value of their estates there must be minimal disruption to their administrative affairs, and that the maintenance and modest alteration of the Cash Management System, as provided herein, is essential to limiting disruptions to the Debtors' operations.

**(iii)     Business Forms, Books And Records**

72.     In the ordinary course of their businesses, the Debtors use a multitude of pre-printed business forms (collectively, the "Business Forms"), including, but not limited to, checks, invoices, purchase orders and stationary, as well as maintain books and records (collectively, the "Books and Records" and, together with the Business Forms, the "Business Forms, Books and Records") in connection with the operation of their businesses.

73.     In order to continue operations in an orderly fashion, the Debtors require use of the Business Forms without alteration or change.  A substantial amount of time and

expense would be required in order to print new checks and other business forms. Although it is possible to change these forms, the Debtors submit that this would create confusion and delay among its employees and third-parties. As such, the Debtors seek a waiver of the requirement that new bank accounts replacing all of the Bank Accounts be opened as of the Petition Date. The Debtors believe that this requirement would unnecessarily and severely disrupt the Debtors' businesses and impair their efforts to preserve the value of the Debtors' estates.

E.  **Debtors' Motion For Entry Of An Interim And Final Order Pursuant To 11 U.S.C. §§ 105(a) And 366 (I) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Services On Account Of Prepetition Invoices, (II) Deeming Utilities Adequately Assured Of Future Performance, And (III) Establishing Procedures For Determining Adequate Assurance Of Payment**

74.    By this Motion, the Debtors are requesting the entry of an order: (i) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (ii) approving the Debtors' proposed offer of adequate assurance and procedures whereby the Utility Providers may request additional or different adequate assurance; (iii) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (iv) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this Motion; and (v) setting a final hearing (the "Final Hearing") on the Debtors' proposed adequate assurance and consideration of entry of the Final Order.

75.    In the ordinary course of business, the Debtors regularly incur utility expenses for telephone, electric, gas, water, sewer, waste management, internet access, and other services (the "Utility Services"). The Debtors' aggregate average monthly cost for utility services is approximately $1,006,582.28. The utility services are provided by approximately

fifty (50) utility companies (the "Utility Providers"). A list of these Utility Providers is attached as **Exhibit A** to the Motion (the "Utility Provider List").

76.     As of the Petition Date and as qualified in the Motion, the Debtors are generally current on payments to the Utility Providers for utility services. Overall, the Debtors have a long and established payment history with most of the Utility Providers indicating consistent payment for utility services with few to no material defaults or arrearages with respect to undisputed Utility Services invoices. As of the Petition Date, however, the Debtors may have had (a) prepetition accounts payable to certain Utility Providers, (b) outstanding checks issued to certain Utility Providers in payment for prepetition charges for utility services that had not cleared the Debtors' bank account prior to the Petition Date or (c) liabilities for prepetition utility services for which the Debtors had not yet been billed. Additionally, as of the Petition Date, the Debtors have posted a $220,000 deposit with Progress Energy Carolinas Inc. to ensure the Debtors' payment obligations.

77.     As adequate assurance of future payment to the Utility Providers, the Debtors propose to deposit cash in an amount equal to the approximate aggregate cost of one half of one month of utility service from the Utility Providers calculated as an historical average for 2010 or $503,291.14 (the "Adequate Assurance Deposits") into an interest-bearing, newly-created, segregated account (the "Utility Account") within ten (10) business days after the date of entry of the Interim Order approving this Motion; provided, however, that, the Debtors, in their sole discretion and without further application to or order of the Court, may reduce the Utility Account upon termination of utility services from a particular Utility Provider in an

amount equal to the approximate cost of one half of one month of utility service from such Utility Provider.[5]

78.     Access to utility services is critical to the Debtors' ongoing operations while they are exploring their strategic options.  Should any Utility Provider refuse or discontinue a utility service even for a brief period of time, the Debtors' operations and administrative functions would be severely disrupted.  Any interruption of utility service to the Debtors' businesses would be severely disruptive and diminish the Debtors' value while they are exploring their strategic options. Certain Utility Providers provide the Debtors with services necessary to run their day-to-day office operations.  Further, the Debtors are dependent upon internet and telephone service to maintain their ability to send and receive electronic communications and records.  In this regard, I believe it is in the best interest of the Debtors, their estates and their creditors to maintain continuous and uninterrupted utility services during these chapter 11 cases.

**F.     Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 363(b), 363(c), 1107(a) And 1108 And Fed. R. Bankr. P. 6003 And 6004 (I) Authorizing Debtors To (A) Pay Prepetition Amounts To Continue Prepetition Insurance Policies, And (B) Pay Certain Prepetition Expenses Related To Their Workers' Compensation Programs; And (II) Authorizing And Directing Financial Institutions To Honor Related Checks And Electronic Payment Requests**

79.     By this Motion, the Debtors seek the entry of an Order (i) authorizing the Debtors to (a) pay certain prepetition obligations in order to continue insurance coverage entered into prepetition and enter into new insurance policies, and (b) pay certain prepetition expenses related to their workers' compensation programs; and (ii) authorizing and directing financial

---

[5]     In the event that the Debtors have multiple utility services accounts with a particular Utility Provider, the Debtors' reduction of the Utility Deposit upon termination of utility services from a particular Utility Provider will be based on those utility services accounts actually terminated.

institutions to receive, process, honor and pay checks presented for payment and electronic payment requests related thereto.

    **(i)**      **Insurance Policies**

        **(a)**      **Workers' Compensation**

        80.    As required by various statutes, in the ordinary course of business, the Debtors provide a workers' compensation benefit program ("Workers' Compensation") for income protection, medical services and rehabilitation services to all employees with job-related injuries or illness in the following states: Arkansas, Delaware, Georgia, Maryland, New Hampshire, North Carolina and Virginia (collectively, the "Covered States"). The Debtors self-insure their workers' compensation liability coverage (the "Self-Insured Workers' Compensation Policy") for all of Arkansas and North Carolina. The Self-Insured Workers' Compensation Policy covers the first $400,000 of any Claim (as defined herein). The Debtors have a backstop workers' compensation insurance policy (the "Excess Self-Insured Workers' Compensation Policy") through Midwest Employers Casualty Company ("Midwest"). Pennsylvania Manufactures' Association Insurance Company ("PMA") is the third-party administrator for the Debtors' Workers' Compensation in Arkansas and North Carolina. The Debtors pay, in the aggregate, approximately $128,000 in fees and $105,000 in premiums annually with respect to their Self-Insured Workers' Compensation Policy and Excess Self-Insured Workers' Compensation Policy. The Debtors also maintain a zero-deductible workers' compensation insurance policy (the "Additional Workers' Compensation Policy," and with the Self-Insured Workers' Compensation Policy, and the Excess Self-Insured Workers' Compensation Policy, the "Workers' Compensation Policies") for the remaining Covered States through Liberty Mutual Insurance Company ("Liberty Mutual"). The Debtors pay, in the aggregate, approximately $17,000 annually in premiums with respect to their remaining Workers' Compensation.

81.     As of the Petition Date, the Debtors have six (6) potential claims under the Self-Insured Workers' Compensation Policy (the "Potential Claims").  Since the Debtors have received no documentation regarding the Potential Claims as of the Petition Date, they are unable to estimate the aggregate asserted amount of the Potential Claims.  However, the Debtors do not anticipate owing any amounts beyond $105,000 with respect to the Potential Claims.

82.     As of the Petition Date, there are approximately twenty-six (26) active claims (the "Active Claims, collectively with the Potential Claims, the "Claims").  The Debtors believe they may have outstanding liability of approximately $575,000 on account of these Active Claims, which amount will be paid over the course of several years.  On average, the Debtors pay approximately $80,000 per month to service Active Claims.

83.     It is critical that the Debtors be permitted to continue their Workers' Compensation benefits and to pay pre-petition claims, assessments and premiums, including those related to the Claims, because alternative arrangements for workers' compensation coverage would almost certainly be more costly.  In addition, failure to maintain this insurance in the various states in which the Debtors conduct business could result in the institution of administrative or legal proceedings against the Debtors and/or their officers and directors.

84.     The Debtors believe that their Workers' Compensation insurance coverage is competitively priced and provides ample coverage.  Additionally, as noted above, the Debtors are typically required to maintain this coverage under state laws.  Accordingly, the Debtors believe that it is in the best interests of their estates to continue their current Workers' Compensation insurance program and request the authority to pay, in their discretion, any and all undisputed amounts due and owing with respect to the Debtors' Workers' Compensation as they come due in the ordinary course of business, including pre-petition or future Claims.

**(b)**     <u>State Workers' Compensation Programs</u>

85.     The states in which the Debtors conduct business and self-insure workers' compensation programs require employers to collateralize their outstanding, unpaid obligations. North Carolina provides an optional aggregated security system ("<u>North Carolina Aggregated Security System</u>") in which qualified-self-insurers may participate to meet their collateral requirements. Specifically, the Debtors estimate that the state of North Carolina will require an annual payment in 2011 of approximately $27,000 to participate in the North Carolina Aggregated Security System. Additionally, the Debtors are required to maintain a $500,000 letter of credit to collateralize the Debtors' outstanding Workers' Compensation obligations in Arkansas (the "<u>Arkansas Letter of Credit</u>"). This letter of credit has been issued by Wilmington Trust Corporation. As of the Petition Date, the Debtors do not owe any amounts for the North Carolina Aggregated Security System or the Arkansas Letter of Credit.

86.     Continuing to make contributions to the State Workers' Compensation Programs is essential for preserving the Debtors' business, property, and assets. Indeed, the Debtors are required by state law to contribute to the State Workers' Compensation Programs. Accordingly, failure to maintain their contributions to those State Workers' Compensation Programs could result in the institution of administrative or legal proceedings against the Debtors and/or their officers and directors.

**(c)**     <u>Other Policies</u>

87.     In the ordinary course of business, the Debtors maintain, in addition to the Workers' Compensation Policy, a number of other insurance policies that provide coverage for, among other things, property coverage, cargo liability, general liability, business automobile liability, commercial umbrella liability, international liability, crime liability, and directors' and officers' liability (collectively, the "<u>General Policies</u>" and together with the Worker's

Compensation Policies, the "Policies").[6]   Under the General Policies, the Company has deductibles ranging from zero to $250,000 for each claim made under a General Policy.  These deductibles are set forth in further detail for the General Policies on **Exhibit A** to the Motion.

88.    The General Policies are essential for preserving the value of the Debtors' business, property and assets.  In many cases, the insurance coverage provided by the General Policies is required by various state and federal regulations that govern the Debtors' commercial activities.  Additionally, failure to maintain adequate insurance may pose a risk to the estates or the public, which constitutes "cause" under section 1112 of the Bankruptcy Code for purposes of converting or dismissing a chapter 11 case.  11 U.S.C. § 1112(b)(4).

89.    For the applicable coverage periods, the annual premiums for the General Policies which the Debtors maintain through several different insurance carriers total approximately $1,750,000.   The General Policies are managed by Wells Fargo Insurance Services USA, Inc. ("Wells Fargo").  The Debtors pay all premiums for the General Policies to Wells Fargo, except for premiums relating to the Debtors' policies through Liberty Mutual.  As of the Petition Date, the Debtors have paid all of their General Policy premiums except for approximately $80,000.[7]  Such amounts are due in the ordinary course of business after the Petition Date.  Additionally, the Debtors have approximately $20,000 in deductibles under their General Liability policy which will come due in the ordinary course of business after the Petition Date.

---

[6]    The Policies are set forth on **Exhibit A** to the Motion.

[7]    This figure does not include amounts due under the Installment Plan (as defined in the Motion).

Additionally, the Debtors have a $50,000 letter of credit in place, the purpose of which was to collateralize the obligations relating to an expired automobile policy held by the Debtors with Hartford.  The letter of credit expires in March of 2011 and all related fees have been paid by the Debtors.

### (d)   **Installment Plan**

90.   Given the cost of maintaining appropriate insurance coverage, it is not always economically advantageous for the Debtors to pay the full yearly premiums on the Policies at inception. Accordingly, prior to the Petition Date and in the ordinary course of business, the Debtors made an initial payment on the five Policies (the "Installment Policies")[8] of approximately $60,400 and have agreed to pay the remainder of their annual premiums on the Installment Policies under an installment plan (the "Installment Plans"). The Installment Plan requires ten (10) monthly payments from the Debtors of approximately $34,500 each, nine (9) of which the Debtors have already made.

91.   Failure to make payments for the Claims, and failure to continue making payments under the State Workers' Compensation Programs and the Installment Plans will cause harm to the Debtors and their estates. If the Debtors are unable to make payments on the Installment Plans, the Debtors' insurance providers who are paid directly by the Debtors on a monthly basis may be able to cancel the relevant Policies as a result of nonpayment. Cancellation of the Policies would then force the Debtors to obtain replacement insurance on an expedited basis. Replacement insurance would likely require the Debtors to pay a lump sum premium for the policy in advance, and would likely be greater than what the Debtors currently pay. Even if the insurance providers were not permitted to terminate the Policies, any interruption of payment could have a severe, adverse effect on the Debtors' ability to qualify for insurance coverage at affordable rates.

---

[8]     The five Installment Policies, set forth in further detail on **Exhibit A** to the Motion, are: the Auto Liability – Layer #2 policy, the International policy, the Excess Workers' Compensation Policy, and both Umbrella policies.

92.     In light of the importance of maintaining the insurance coverage with respect to the Debtors' business activities, I believe it is in the best interests of the Debtors' estates to honor their monthly insurance obligations under the Installment Plans, to continue to pay under the State Workers' Compensation Programs, and to pay the Claims.

**G.      Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 363(b), 363(c), 541(d), 1107(a) And 1108 And Fed. R. Bankr. P. 6003 And 6004 (I) Authorizing The Debtors To Pay Certain Prepetition Taxes (II) Authorizing And Directing Banks And Other Financial Institutions To Honor All Related Checks And Electronic Payment Requests For Payment Of Such Amounts And (III) <u>Granting Related Relief</u>**

93.     By this Motion, the Debtors seek the entry of an Order (i) authorizing, but not directing, the Debtors to pay all prepetition use and franchise taxes, as well as all other taxes for which there may be personal liability for officers and directors; (ii) authorizing and directing banks and other financial institutions to receive, process, honor and pay all checks presented for payment and electronic payment requests related to the foregoing; and (iii) granting related relief.

**(i)      <u>Use Taxes</u>**

94.     The Debtors collect and remit to certain taxing authorities (collectively, the "Taxing Authorities") a variety of taxes.

95.     The Debtors are required to pay use taxes (collectively, the "<u>Use Taxes</u>") when purchasing certain tangible personal property from vendors.  The Debtors issue Certificates of Exemption (Streamlined Sales and Use Tax Agreement) to all vendors.  Under these circumstances, governing law requires the Debtors to self-assess the amount of sales taxes that would have been owed on purchases from vendors and pay these amounts as Use Taxes to the applicable Taxing Authorities.  In most jurisdictions, the Debtors remit the Use Taxes to the

Taxing Authorities on a monthly basis. Typically, the amount of Use Taxes remitted monthly by the Debtors to Taxing Authorities is $85,000.

96.     As of the Petition Date, the Debtors believe they are current in that they have paid the last Use Taxes when due. The Debtors have prefunded their Use Taxes for the month of December 2010.

**(ii)     Franchise Taxes**

97.     The Debtors pay franchise, business, capital stock and similar taxes (collectively, the "Franchise Taxes") to certain of the Taxing Authorities to maintain the right to operate their business in the applicable taxing jurisdictions. Some states assess a flat Franchise Tax on all businesses, and other states assess a Franchise Tax based upon net operating income. Certain states will refuse to qualify a debtor to do business in a state if Franchise Taxes have not been paid. Most jurisdictions assess Franchise Taxes on an annual basis, in arrears. In conjunction with the Franchise Taxes, certain of the Taxing Authorities also assess various licensing fees.

98.     For fiscal year 2009, the Debtors remitted approximately $191,000 in Franchise Taxes to Taxing Authorities. As of the Petition Date, the Debtors believe that they are current on payment of all Franchise Taxes. The Debtors anticipate, however, that certain Franchise Taxes will come due during the course of these chapter 11 cases.

**(iii)     Other Taxes Imposing Personal Liability upon Directors and Officers**

99.     Many federal, state and local Taxing Authorities impose personal liability on directors and/or responsible officers of entities responsible for collecting or paying certain Use Taxes and Franchise Taxes (collectively, the "Prepetition Taxes") to the extent that such taxes are not remitted. Thus, if any of the Prepetition Taxes remain unpaid, the Debtors' directors and responsible officers may be subject to lawsuits or even criminal prosecution on account of such

nonpayment during the pendency of these chapter 11 cases. Such lawsuits or proceedings would create a significant distraction for the Debtors' directors and responsible officers at a time when they should be focused on exploring the Debtors' strategic options to maximize the value of the Debtors' business and assets. As of the Petition Date, the Debtors believe they are current on payment of all Prepetition Taxes. The Debtors anticipate, however, that certain Prepetition Taxes, including Prepetition Taxes related to the prepetition period, will come due during the course of these chapter 11 cases

100. Although the Debtors believe that all Prepetition Taxes for which the Debtors' directors and/or responsible officers may be personally liable are described herein, it is possible that other prepetition obligations similar in nature (and in threat of personal liability) to such Prepetition Taxes may be uncovered by the Debtors subsequent to the filing of this Motion. To the extent that such prepetition obligations exist, the Debtors will consider such obligations "Prepetition Taxes" as that term is defined and used herein and request the authority to pay such Prepetition Taxes as they may arise in the ordinary course of their businesses.

**H. Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 363(b), 363(c), 541(b)(7), 541(d), 1107(a), And 1108 And Fed. R. Bankr. P. 6003 And 6004 (I) Authorizing The Debtors To Pay Certain Prepetition (A) Wages, Salaries And Other Compensation And (B) Employee Medical And Similar Benefits; (II) Authorizing And Directing Banks And Other Financial Institutions To Honor All Related Checks And Electronic Payment Requests; And (III) Granting Related Relief**

101. By this Motion, the Debtors are requesting that the Court enter an Order (i) authorizing, but not directing, the Debtors to pay all prepetition (a) wages, salaries, vacation, and other accrued compensation, as well as all withholdings and deductions related thereto and (b) contributions to and benefits under employee medical and similar benefit plans; (ii) authorizing and directing banks and other financial institutions to receive, process, honor and

pay all checks presented for payment and electronic payment requests relating to the foregoing; and (iii) granting related relief.

102.     A description of these prepetition employee related obligations or programs is provided below.

**(i)     The Debtors' Employees**

103.     As of December 8, 2010, the Debtors employed approximately 3,017 active employees (the "Employees") for the performance of services in connection with their operations, of whom a majority are hourly employees paid on a weekly schedule (the "Hourly Employees"). The other Employees consist of three types of salaried employees – those paid on a weekly basis (the "Salaried Employees"), those paid on a monthly basis (the "Monthly Employees"), contract workers who are paid on a bi-monthly basis ("Contract Workers").[9]

104.     As of the Petition Date, the Debtors' employees consist of: (i) approximately 2,754 Hourly Employees; (ii) approximately 257 Salaried Employees; approximately 6 Monthly Employees; and (iii) approximately 3 Contract Workers. None of the Employees are covered by collective bargaining agreements. In addition to the Salaried and Hourly Employees and the Contract workers, the Debtors also utilize several temporary staffing agencies to provide additional support on an as-needed basis (the "Temporary Employees"). The Debtors are currently utilizing approximately 74 Temporary Employees, provided to the Debtors through 6 employment agencies.

105.     The Debtors' operations and employees are located in: Georgetown, Delaware which has 53 employees, Atlanta, Georgia, which has five (5) employees, Batesville,

---

[9]     While not Employees of the Debtors, Contract Workers enjoy the Employee Benefits (as defined below) as the Employees.

Arkansas, which has 1,263 employees, Mocksville, North Carolina, which has 371 employees, Pittsboro, North Carolina which has 585 employees, and Siler City, North Carolina which has 740 employees.

106. The Debtors' monthly gross payroll is approximately $6,700,000. The aggregate payroll amount does not include any annual incentive bonuses, which are paid in March or April for the preceding year, or quarterly incentive bonuses paid to certain sales or operating employees.[10]

**(ii)** **Prepetition Employee Claims**

107. As described more fully below, the Debtors owe certain of the Employees monies on account of wages, salaries, vacation, and other accrued compensation that were earned during or related to a period prior to the Petition Date, but that are scheduled to be paid postpetition. Attendant to these payments, the Debtors owe employer taxes and withholding taxes to local, state and federal authorities. In addition, the Debtors withhold certain amounts from some of the Employees' paychecks for contributions to various programs and funds, including, without limitation, the 401(k) plan, medical and dental plans, child support and garnishments. All of the foregoing prepetition employee claims are collectively referred to hereinafter as the "Prepetition Employee Claims."

108. Failure to pay the Prepetition Employee Claims would severely undermine the Employees' morale and result in significant hardship to the Employees. To retain the services of the Employees and maintain their morale and loyalty during these chapter 11 cases, the Debtors seek authority to satisfy the Prepetition Employee Claims to the extent such

---

[10]     The Debtors are not seeking approval of the payment of any annual incentive bonuses or quarterly incentive bonuses accrued prepetition.

payments are provided for in the Debtors' budget.  As of the Petition Date, the Debtors estimate that the aggregate amount of the Prepetition Employee Claims is approximately $2,200,000 It is the Debtors' belief that no Employee's unpaid prepetition salary or wages exceeds the $11,725 threshold provided in Section 507(a)(4) of the Bankruptcy Code.

109.    A description of the Prepetition Employee Claims follows below.

**(a)    Prepetition Wages and Salaries**

110.    Hourly Employees.  Hourly Employees are paid on a weekly basis (every Thursday), covering the hours worked during the week prior to the week in which they are paid.[11]  Hourly Employees were last paid on December 14, 2010 for the period ending December 12, 2010.  The total gross amount paid to Hourly Employees on December 14, 2010 was approximately $1,440,000.  Hourly Employees will be paid next on December 23, 2010.

111.    Salaried Employees.  Salaried Employees are paid on a weekly basis (every Thursday), covering the hours worked during the week in which they are paid.[12]  Salaried Employees were last paid on December 14, 2010 for the period ending December 19, 2010.  The total gross amount paid to Salaried Employees on December 14, 2010 was approximately $156,000.  Salaried Employees will be paid next on December 23, 2010.

112.    Monthly Employees.  Monthly Employees are paid on a monthly basis, covering the hours worked during the month in which they are paid.  Monthly Employees were last paid on December 10, 2010, for the period ending December 31, 2010.  The total gross

---

[11]    For payroll purposes, the work week starts each Monday at 12:01 a.m. and ends the following Sunday at 12:00 a.m. (Midnight).  Each new payroll period begins Monday of the week the Hourly Employees are paid for the prior week.

[12]    For payroll purposes, the work week starts each Monday at 12:01 a.m. and ends the following Sunday at 12:00 a.m. (Midnight).  Each new payroll period begins Monday of the week after the Salaried Employees are paid for the prior week.

amount paid to Monthly Employees on December 10, 2010 was approximately $90,000. Monthly Employees will be paid next on January 12, 2011.

113. <u>Contract Workers</u>. Contract Workers are paid on a bi-monthly basis, on the closest Thursday to the 15th and the 30th of each month, covering the hours worked during the month in which they are paid. Monthly Employees were last paid on December 15, 2010, for the period ending December 15, 2010. The total gross amount paid to Contract Workers on December 15, 2010 was approximately $55,000. The aggregate amount of current earned, but unpaid, fees and expenses owed to Contract Workers (the "<u>Prepetition Contract Worker Obligation</u>") is approximately $22,750 as of the Petition Date.

114. <u>Temporary Employees</u>. In addition to the Employees, the Debtors also from time to time require the assistance of temporary employees (the "<u>Temporary Employees</u>"). While the Debtors do not directly compensate their Temporary Employees, the Debtors' failure to pay for these services could severely hamper their ability to obtain temporary staffing as needed during the course of these chapter 11 cases. The average monthly cost for all Temporary Employees is approximately $250,000 (the "<u>Temporary Employee Costs</u>").13 The Debtors estimate the outstanding pre-petition amounts owed for Temporary Employees Costs (the "<u>Prepetition Temporary Employee Obligation</u>") is approximately $175,000 as of the Petition Date.

115. <u>Prepetition Wages and Salaries</u>. Based on the Debtors' ordinary course payroll schedule, the aggregate amount of current earned, but unpaid, prepetition wages and salaries inclusive of withholding for payroll taxes (the "<u>Prepetition Wages and Salaries</u>") is

---

13      The average monthly cost consists of open invoices that have been billed, but not yet paid, and amounts that have been incurred but not yet billed.

approximately $1,440,000 as of the Petition Date. The aggregate amount of Prepetition Wages and Salaries could be higher as some payroll checks from prior work periods may be and/or remain outstanding and may need to be reissued due to the Debtors' filing for chapter 11 protection.

**(b)**      **Prepetition Payroll Taxes**

116.      Attendant to the payment of Employee wages and salaries is the Debtors' obligation to pay local, state and federal withholding taxes and employer taxes. The Debtors withhold the withholding taxes and Social Security and Medicare contributions from payroll and pay these amounts to the appropriate authorities on a weekly, quarterly or annual basis, as applicable, from the Debtors' cash accounts.[14]

117.      The aggregate amount of prepetition withholding taxes, tax deposits and processing fees inclusive of both the Debtors' portion and the employee portion (the "Prepetition Payroll Taxes"). Depending on the week, total Prepetition Payroll Taxes payments range from approximately $320,000 to $430,000. The Debtors believe that as of the Petition Date, the Prepetition Payroll Taxes are prefunded for two weeks.

118.      The Debtors also directly pay state and local unemployment taxes and contributions ("Unemployment Taxes" together with the Prepetition Payroll Taxes, the "Prepetition Tax Claims"). Federal and State Unemployment Taxes due for the fourth quarter of 2010 are scheduled to be paid January 31, 2011 and are estimated to be approximately $40,000.

---

[14]      The payroll accounts are more fully described in the Debtors' motion for authority to continue use of their cash management system, filed contemporaneously herewith.

**(c)**     **Vacation and Personal Time**

119.    The Debtors' employees are entitled to vacation days based on service ("Vacation"). Hourly employees earn vacation based on the following scale:[15]

| Years of Service | Annual Leave |
|---|---|
| Less than 1 year | 0 days |
| 1 year up to 5 years | 5 days |
| 5 years up to 7 years | 7 days |
| 7 years up to 15 years | 15 days |
| 15 years up to 25 years | 20 days |
| After 25 years and each year thereafter | 25 days |

120.    Salaried employees earn vacation time based on the following scale:

| Years of Service | Annual Leave |
|---|---|
| Less than 1 year | 5 days |
| 1 year up to 5 years | 10 days |
| 5 years up to 10 years | 15 days |
| 10 years up to 25 years | 20 days |
| After 25 years and each year thereafter | 25 days |

121.    For all Employees the vacation year begins January 1, 2010 and ends December 31, 2010. Unused vacation time does not carry over into the next year.

122.    The Debtors estimate that as of the Petition Date the value of all Vacation accrued by Employees, but not yet used by the Employees (the "Prepetition Vacation Amount") is approximately $600,000.

123.    Holidays. Employees (excluding Crestwood Farms Employees) are scheduled for eight (8) paid holidays ("Holidays") per year. Crestwood Farms Employees are scheduled for seven (7) paid holidays per year.

---

[15]    Excluding Crestwood Farms Employees. Crestwood Farms Employees are entitled to 5 days of vacation for 1 year up to 2 years of service and 10 days of vacation for 2 years of service and above.

124. _Overtime._  Any non-exempt Employee that works over forty (40) hours a week is eligible for overtime pay ("_Overtime_").  The value of all prepetition Overtime is included in the outstanding amount of the Prepetition Wages and Salaries owed.

125. The Debtors believe honoring their obligations to Employees with respect to Overtime and permitting Employees to take Vacation Time and Holidays in accordance with the Debtors' policies and procedures is imperative to maintaining the morale and loyalty of the Employees during these chapter 11 cases.

**(d)** **Designated Withholdings**

126. The Debtors withhold money from the Employee payroll pursuant to certain Employees' instructions or orders by judicial or administrative authorities (collectively, the "_Designated Withholdings_") for contributions or remittance to various programs and funds including, without limitation, certain supplemental insurance programs, savings plans, child support, garnishments, and for other purposes.  Failure to remit these funds to the appropriate programs or funds will be regarded by the Employees as a misappropriation of their wages or salaries and the cessation of certain benefits to which they reasonably believe they are entitled as a result of the deductions.

**(e)** **Reimbursable Employee Business Expenses**

127. Before the Petition Date, certain of the Employees regularly incurred business expenses, which, consistent with ordinary practice, are reimbursable by the Debtors (the "_Reimbursable Expenses_").  The Reimbursable Expenses include, without limitation, expenses for work-related travel, lodging, auto expenses, telephone charges and meals.  When an Employee has incurred a Reimbursable Expense, it is the Debtors' policy to require the Employee to file an expense report within fourteen (14) days of incurring the expense.  The Debtors generally reimburse an Employee within seven (7) business days of the receipt of a

properly filed expense report. It would be inequitable to require the Employees to bear these expenses, all of which were incurred on behalf of the Debtors with the expectation that they would be reimbursed promptly. As of the Petition Date, Reimbursable Expenses in the system but not paid total approximately $12,000, however, given the nature and timing of the process the Debtors cannot accurately quantify the actual unpaid prepetition Reimbursable Expenses. Over the twelve (12) full calendar months preceding the Petition Date, Reimbursable Expenses averaged approximately $50,000 per month. Over the last three (3) full calendar months preceding the Petition Date, Reimbursable Expenses have been approximately $50,000 per month (the "Prepetition Reimbursable Expenses").

      (iii)   **Employee Benefits**

128. Before the Petition Date, the Debtors offered their full time Employees standard employee benefits funded by either the Debtors, the Employees or both, including, among others: variety of employee benefit plans and policies, including medical and health insurance, group life insurance, long-term disability, supplemental life, dental, vision, accidental, and critical injury insurance, flexible spending plan, tuition reimbursement, COBRA, relocation expenses, 401(k) plans, and other similar such benefits (collectively, the "Employee Benefits"). Failure to continue these Employee Benefits would severely undermine the Employees' morale and result in significant hardship to the Employees.

129. As of the Petition Date, the Debtors were obligated to pay certain contributions to and benefits under the plans related to such Employee Benefits (collectively, the "Benefit Contributions"). Those Benefit Contributions either (a) were due and unpaid by the Debtors as of the Petition Date or (b) remained unpaid as of the Petition Date because certain Benefit Contributions accrued either in whole or in part prior to the commencement of these chapter 11 cases, but will not become payable in the ordinary course of the Debtors' business

until a later date. The Debtors' estimate that the total of such Benefit Contributions as of the Petition Date is approximately $1,300,000 (the "Benefit Contribution Obligation"). The Debtors also seek authority to continue the Employee Benefits in the ordinary course of business during the postpetition period.

130.  Medical and Health Insurance. The Debtors provide through a third-party administrator a self-insured medical insurance plan (the "Medical Plan") to their employees for which it accrues approximately $476,000 each month and withholds approximately $165,000 per month from participating employees. Year to date claims and associated fees have been approximately $630,000 per month. As of the Petition Date, the Debtors have approximately $1,230,000 of incurred, but not reported, liabilities related to the Medical Plan.

131.  Group Life Insurance and Long-Term Disability. The Debtors provide their employees with group life insurance coverage and long-term disability plans (the "Group Life and Long-Term Disability Plans"). The net monthly cost to the Debtors of these plans is approximately $5,200. The payments under the Group Life and Long-Term Disability Plans are current through December 31, 2010.

132.  Supplemental Life Insurance, Dental, Vision, Accident and Critical Injury Insurance: The Debtors maintain supplemental life insurance, dental, vision, accident and critical injury insurance plans (collectively the "Additional Benefit Plans") that are all funded by the employees. The monthly withholdings for these benefits are approximately $102,500. Specifically, the average monthly withholding for the supplemental life insurance is $21,000, $43,000 for the dental insurance, $9,000 for the vision insurance, and $29,000 for critical care and accident insurance. The payments under the Additional Benefit Plans except for the critical care and accident insurance are current through December 31, 2010. As of the Petition Date, the

Debtors have collected approximately $21,000 in accident and critical insurance premiums that had not yet been paid to the vendor.

133.     Flexible Spending Plan.  The Debtors offer Employees the option to sign up for a flexible spending account (the "Flexible Spending Plan").  The Flexible Spending Plan allows Employees to set aside pre-tax wages to use on eligible expenses.   The current amount outstanding under the Flexible Spending Plan as of the Petition Date is included outstanding Benefit Contribution amounts.  As of the Petition Date, the Debtors have approximately $450 of incurred, but not reported, expenses related to the Flexible Spending Plan.

134.     COBRA.  The Debtors pay in the ordinary course of business certain costs associated with the provision of COBRA extended group health benefits insurance coverage to certain former employees and their dependents (the "COBRA Coverage").  Under the COBRA Program, an Employee may elect to receive COBRA Coverage for the continuance of the Medical Plans, Additional Benefit Plans, and Flexible Spending Plan. As of the Petition Date, there are approximately 25 Employees using the COBRA Program.

135.     Prepetition unpaid costs associated with this obligation (the "Prepetition COBRA Obligations") are estimated by the Debtors to be *de minimis*.

136.     Tuition Reimbursement.   The Debtors also maintain a tuition reimbursement program (the "Tuition Reimbursement Program"), available to all Employees for courses related to the Employee's vocation or that qualify the Employee for a promotion.  Full-time employees who have at least one year of continuous service with the Debtors may receive approval for partial tuition reimbursement for a four-year degree.  Employees will receive full reimbursement for courses that pertain directly to their current positions.  The Debtors will also reimburse all approved non-related courses at 75% tuition.   As of the Petition Date, the

outstanding prepetition amounts due under the Tuition Reimbursement Program are approximately $8,000.

137.  Relocation Expenses.  The Debtors also maintain a program to provide relocation expenses to employees who qualify (the "Relocation Expense Program").  The Debtors utilize a third party vendor to maintain and process employee expenses.  The Employees submit their expenses to the vendor who in turn bills the Debtors.  As of the Petition Date, the outstanding amounts due under the Relocation Expense Program are $25,000.

138.  401(k) Contributions: The Debtors maintain 401(k) retirement plans for the benefit of their employees.  The 401(k) contributions are paid weekly and the approximate net monthly cost to the Debtors of these contributions is $30,000.

**(iv)  Retirement and Pension Plans**

139.  In the past, the Debtors sponsored two pension plans for their Employees: (a) the Hourly Pension Plan; and (b) the Salaried Pension Plan. Both Plans were frozen as of December 31, 2002.  As of January 1, 2010, the Hourly Pension Plan was merged into the Salaried Pension Plan.  Although the Pension Plans are frozen, participants are eligible to receive pension benefits at termination or retirement.  The Pension Plans' funds are held in trust by the Principal Financial Group ("Principal Financial").  The Debtors incur certain costs associated with maintaining the assets held in trust in connection with the Pension Plans, which are paid for from trust assets.  Specifically, approximately $20,125 per quarter in administrative fees to Principal Financial for its services and $11,000 per year for its reporting services.  Additionally, approximately $124,000 in trust assets are used annually to fund payments to Pension Benefit Guaranty Company ("PBGC").  The Debtors incur an average of approximately $1.5 million in claims under the Pension Plans per year.  As of the Petition Date, the unfunded actuarial liability under the Pension Plans totaled approximately $9,948,000.

**(v)**     <u>**Authority to Honor or Reissue Prepetition Checks and Drafts**</u>

140.     The Debtors pay all payroll and other obligations due to their Employees by check or by direct deposit at the election of the Employee. Due to the nature of the Debtors' workforce, a high percentage of their employees are paid by check rather than wire. As a result of the timing of these chapter 11 cases, checks previously issued by the Debtors to their Employees may not yet have been presented for payment or may not yet have cleared the banking system and, accordingly, may be dishonored unless the Court authorizes and directs the banks in which the Debtors maintain their payrolls and other disbursements to honor these checks.

141.     The Debtors request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor and pay any and all checks drawn or draft requests made on the Debtors' accounts related to Prepetition Employee Claims, whether presented prior to or after the Petition Date, upon the receipt by each such bank and institution of notice of such authorization, provided only that sufficient funds are on deposit in the applicable accounts to cover such payments. The Debtors have, or will have, on deposit sufficient funds in their bank accounts to satisfy the Prepetition Employee Claims for which they seek immediate payment so that their financial institutions will not be prejudiced by an order directing them to honor the Debtors' checks or fund transfer requests with respect to such amounts.

**(vi)**     <u>**Authority to Pay Incidental Costs**</u>

142.     In addition, the Debtors request that they be permitted, but not directed, to pay all costs incident to the payment of the Prepetition Employee Claims and Employee Benefits, such as processing costs. The Debtors further represent that they expect to have available cash sufficient to pay all Prepetition Employee Claims and honor the Employee

Benefits, to the extent required herein, and all costs incident thereto, as such amounts become due. The Debtors estimate that payments of the Prepetition Employees Claims and Employees Benefits will not exceed $3,500,000.

143. The Debtors' maintenance of their positive relationships with the Employees is critical to the continued reliability and efficiency of their ongoing operations while the Debtors explore their strategic options. Paying the Employee Claims and Benefits will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, the Debtors believe that without the requested relief, their Employees may seek alternative employment opportunities. Such a development would deplete the Debtors' workforce, hindering the Debtors' ability to meet their customer obligations and, likely, reduce the value of the Debtors. The loss of valuable Employees and the subsequent recruiting of necessary replacement employees would be distracting at this critical time when the Debtors are stabilizing operations and preparing for the sale of some or all of the Debtors' business and assets. Further, if the Debtors lose valuable Employees, they will incur recruiting expenses in locating replacement workers. Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefit and related obligations, including the Employee Wages and Benefits that accrued prepetition.

I. **Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 363(b), 363(c), 1107(a) And 1108 And Fed. R. Bankr. P. 6003 And 6004 (I) Authorizing The Debtors To (A) Honor And Perform Certain Prepetition Obligations To Customers; (B) Continue Customer Programs And (C) Honor Certain Other Prepetition Obligations Necessary To Maintain The Existence Of Customer Programs And (II) Granting Related Relief**

144. By this Motion, the Debtors seek the entry of an Order (i) authorizing, but not directing, the Debtors, in their business judgment and sole discretion, to (a) perform and

honor certain undisputed prepetition obligations to customers related to prepetition customer programs (collectively, the "Customer Programs"); (b) continue, renew, replace, implement new and/or terminate the Customer Programs in the ordinary course of business, without further application to the Court, and (c) honor and perform certain other prepetition obligations necessary to maintain the existence of the Customer Programs; and (ii) granting related relief.

**(i)     The Customer Programs**

145.    The Debtors offer a variety of rebates and incentives to their customers on a customer by customer basis.  These rebates include, but are not limited to, meeting certain target sales, accruals based on total volume sales, advertising rebates, and other rebates related to sales and special advertising programs.

146.    The Customer Programs offered by the Debtor vary on a customer by customer basis and while some are contractual (the "Contractual Programs"), the Debtors also maintain a discretionary program (the "Discretionary Program").

147.    Contractual Programs.   The Contractual Programs are created on a customer by customer basis.  Through the Contractual Programs, the customer earns rebates for meeting certain criteria.  These rebates are then remitted to the customers in two ways (i) direct check paid on a monthly, quarterly, or upon request basis; or (ii) deductions from subsequent bills on a monthly, quarterly, or upon request basis.   Though this Motion, the Debtors are seeking to continue the Contractual Programs in the ordinary course of business.  As of the Petition Date the aggregate outstanding rebates accrued, but not yet paid, to customers through the Contractual Programs is approximately $750,000.

148.    Discretionary Programs.   The Discretionary Programs involve the application of rebates accrued on the Debtors books against the costs of special programs requested by the customer.  For example, as the Debtors accrue rebates for certain customers,

should a customer request the Debtors participate in a special promotion or program, the Debtors can offset the cost of that special promotion or program against the rebates accrued in the Debtors books and records. As of the Petition Date the aggregate outstanding rebates accrued, but not yet paid, to customers through the Discretionary Programs is approximately $350,000.

**(ii)**     **The Critical Need to Maintain and Continue the Customer Programs**

149.     The Debtors' customers are the backbone of their business. The ability to honor and perform their obligations with respect to and continue the Customer Programs is critical to the goodwill with their customers the Debtors have worked hard to establish. Such Customer Programs have allowed the Debtors to develop and sustain a positive reputation in the marketplace for their merchandise and services. The Debtors' business and, ultimately, the success of the Debtors' proposed expedited sale depends largely on maintaining the loyalty of their customer base.

150.     Unless the Debtors can take the measures requested by this Motion to alleviate customer concerns, the Debtors believe that the bankruptcy filing itself may have some negative impact on customers' attitudes towards the Debtors' products. In particular, if customers perceive that the Debtors are unable or unwilling to fulfill their prepetition obligations under and/or continue the Customer Programs, the Debtors' goodwill and business relationships may erode. To prevent any such occurrence, the Debtors desire to honor and perform their prepetition obligations under and continue during the postpetition period those Customer Programs that were beneficial to their businesses and cost-effective during the prepetition period. Such relief is necessary to preserve the Debtors' critical customer relationships and goodwill, thereby maximizing the value of the Debtors' business and assets for the benefit of the estates.

151. For these and for the other reasons set forth herein, I believe the relief requested herein is in the best interests of the Debtors' estates, their creditors and other parties in interest in these cases.

**J. Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 363(b), 363(c), 1107(a), And 1108 And Fed. R. Bankr. P. 6003 And 6004 Authorizing The Debtors To Honor Prepetition Obligations To And Continue Prepetition Practices With Shippers, Warehousemen And Other Lien Claimants**

152. By this Motion, the Debtors seek the entry of an Order authorizing, but not directing, the Debtors, in their business judgment and sole discretion, to honor certain undisputed prepetition obligations to and continue during the postpetition period their prepetition practices with (i) domestic commercial common carriers, movers, shippers, freight and certain other shipping-related service providers (collectively, the "Shippers"), (ii) third-party warehousemen (collectively, the "Warehousemen"), and (iii) certain other potential lien claimants (collectively, the "Lien Claimants").

153. The Debtors manage the breeding, hatching and growing of chickens. They also process chickens and prepare chicken products for distribution and sale along with goods such other poultry related products. The Debtors operate throughout the United States and internationally. Maintaining the Debtors' businesses requires the coordinated efforts of a variety of third party common and other carriers and freight shipment providers who transport goods via truck and rail. The Debtors also utilize a number of third party warehouse facilities (collectively, the "Warehouse Facilities").

**(i) Shippers**

154. In the ordinary course of their business, the Debtors engage Shippers in various aspects of their business including, but not limited to, moving both raw and cooked chicken between processing plants, warehouse facilities, and customers, as well as transporting

the grain, packaging, and ingredients necessary for the Debtors' operations. To facilitate efficient and timely shipment and delivery, the Debtors rely upon the services of the Shippers. It is critical to the Debtors' operations and efforts to maximize the value of their estates that they maintain a reliable and efficient transport system to ensure timely shipment and delivery of materials and goods, which will require the continued and uninterrupted services of the Shippers.

155. Any failure by the Debtors to honor their obligations to the Shippers (the "Shipper Obligations") will likely have a materially adverse impact on the reliability and efficiency of the current transport system. If Shipper Obligations remain unpaid, the Debtors face the real possibility that certain of the Shippers may refuse to continue their respective services. Further, under some state laws, a shipper may have a lien on the goods in its possession, which secures the charges or expenses incurred in connection with the transportation and/or storage of the goods.[16] Accordingly, certain Shippers may assert that they are entitled to possessory liens for transportation, shipment and delivery or storage of the Debtors' materials and goods in their possession and may refuse to deliver or release such materials and goods before their claims have been satisfied and their liens redeemed.[17]

156. To avoid any potential interruption or delay in the Debtors' transport system, which interruption or delay will likely have a material adverse impact on the Debtors' operations and efforts to maximize the value of their estates, it is imperative that the Debtors

---

[16]     For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." U.C.C. § 7-307(1) (2003).

[17]     Notwithstanding the foregoing, the Debtors do not believe that the Shippers have the right to refuse performance or assert liens.

have the ability to satisfy Shipper Obligations in order to maintain the continued and uninterrupted services of the Shippers.

157. In satisfying any Shipper Obligations, the Debtors will, in their discretion, attempt to condition any payment on the written acknowledgement from the applicable Shipper that such Shipper will continue to provide its services to the Debtors on terms that, at a minimum, it provided to the Debtors prior to the Petition Date, or such other trade practices and programs that are at least as favorable to the Debtors as those in effect prior to the Petition Date. The Debtors reserve the right to negotiate more favorable trade terms with any Shipper as a condition to payment of any such Shipper Obligation. Further, the Debtors will only pay the claims of the Shippers that they believe, in their business judgment, are necessary or appropriate. In determining whether such payments are necessary or appropriate, the Debtors will consider: (a) whether the benefits to the Debtors' estates and creditors from making such payments would exceed (i) the costs that the Debtors would incur by bringing actions to compel the turnover of such goods and (ii) the delays associated with such actions; and (b) whether the additional expenses the Debtors would incur (in the form of premium shipping and storage costs) to replace the Shippers would exceed the amount of unpaid prepetition claims.

158. Over the past six months, the average aggregate monthly amount of Shipper Obligations was approximately $1,600,000. As of the Petition Date, the Debtors estimate that the aggregate outstanding amount of Shipper Obligations is approximately $1,100,000.

**(ii)** **Warehouse Facilities**

159. In the ordinary course of the Debtors' business, the Debtors regularly utilize the services of third-party warehouses to store goods in transit, which are being shipped to the Debtors' customers and goods that are being processed. Generally, the Warehousemen

invoice the Debtors on an activity based plus rent basis or use per unit rate basis for their services.

160.    Any failure by the Debtors to honor their obligations to the Warehousemen (the "Warehousemen Obligations") will likely have a materially adverse impact on the reliability and efficiency of the current warehousing and transport system.    If Warehousemen Obligations remain unpaid, the Debtors face the real possibility that certain of the Warehousemen may refuse to continue their respective services.    Further, under some state laws, a Warehousemen may have a lien on the goods in its possession, which secures the charges or expenses incurred in the storage of the goods.    Accordingly, certain Warehousemen may assert that they are entitled to possessory liens for storage of the Debtors' materials and goods in their possession and may refuse to deliver or release such materials and goods before their claims have been satisfied and their liens redeemed.[18]

161.    To avoid any potential interruption or delay in the Debtors' transport system, which interruption or delay will likely have a material adverse impact on the Debtors' operations and efforts to maximize the value of their estates, it is imperative that the Debtors have the ability to satisfy Warehousemen Obligations in order to maintain the continued and uninterrupted services of the Warehousemen.

162.    Over the past six months, the average aggregate monthly amount of Warehousemen Obligations was approximately $500,000.    As of the Petition Date, the Debtors estimate that the aggregate outstanding amount of Warehousemen Obligations is approximately $600,000.

---

[18]    Notwithstanding the foregoing, the Debtors do not believe that the Warehousemen  have the right to refuse performance or assert liens.

### (iii) Other Lien Claimants

163.    In the ordinary course of the Debtors' business, the Debtors sometimes require the services of the Lien Claimants, who are primarily third-party service providers that install, repair and/or replace various parts and components essential to the continued and uninterrupted operation of the Debtors' equipment and machinery.  Although the Debtors have the capability to perform certain routine repairs and maintenance, when necessary, the Debtors rely heavily upon the highly-skilled or critically-located Lien Claimants to provide timely repairs and maintenance to equipment parts and components. Prior to the Petition Date, the Lien Claimants performed such services both on-site, as well is in their respective repair shops.  At any given time, the Debtors may have certain critical parts and components in the process of being serviced by the Lien Claimants.

164.    As of the Petition Date, the Debtors believe that there are no outstanding amounts owed to the Lien Claimants.

165.    In the event that there are any outstanding obligations to the Lien Claimants (the "Lien Claimant Obligations") that are not honored, however, the Debtors face the real possibility that certain of the Lien Claimants may refuse to continue their respective services for the Debtors, including repair, maintenance, installation and other servicing obligations—services critical to the reliability and efficiency of the Debtors' operations.  Additionally, the Debtors' failure to pay the Lien Claimants likely would result in the Lien Claimants having a right to assert liens or interests against the Debtors' property.  Pursuant to section 362(b)(3) of the Bankruptcy Code, acts to perfect such liens or interests, to the extent consistent with section 546(b) of the Bankruptcy Code, are expressly excluded from the automatic stay otherwise established by section 362(a) of the Bankruptcy Code.  Moreover, under section 546(b) of the Bankruptcy Code, a debtor's lien avoidance powers "are subject to any generally applicable law

that . . . permits perfection of an interest in property to be effective against an entity that acquires rights in such property before the date of perfection."[19]  Therefore, notwithstanding the automatic stay established by section 362 of the Bankruptcy Code, many of the Lien Claimants may attempt to perfect and assert liens or interests against the Debtors' property.  Thus, they would hold secured claims that would, in any event, be required to be paid in full under section 1129(b)(2)(A) of the Bankruptcy Code.  Finally, in some situations, the Lien Claimants may be in possession of critical property of the estate and may assert possessory liens and interests and a right to retain the property pending payment in full of their lien claims.  In such situations, the value of the property likely will outweigh the amount of the lien claims.  It would be detrimental to the Debtors' estates not to have an authorized means by which the property can be quickly retrieved without legal action.

166.    Accordingly, I believe it is imperative that the Debtors have the ability to satisfy all Shipper Obligations, Warehousemen Obligations, and Lien Claimant Obligations (to the extent discovered by the Debtors.)

**K.    Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 363, 364, 503(b), 1107(a) And 1108 And Fed. R. Bankr. P. 6003 And 6004 Authorizing The Debtors To Honor Prepetition Claims Of Feed Ingredient Suppliers And Sales Brokers**

167.    By this Motion, the Debtors seek the entry of an Order authorizing, but not directing, on an emergency basis, the Debtors to (i) pay, in their sole discretion, certain undisputed prepetition obligations to feed ingredient suppliers and sales brokers and (ii) continue

---

[19]    The Debtors do not concede that any liens (contractual, common law, statutory or otherwise) described in this Motion are valid, and the Debtors expressly reserve the right to contest the extent, validity, and perfection of all such liens, and/or to seek avoidance thereof.

in their sole discretion during the postpetition period their prepetition practices with feed ingredient suppliers and sales brokers.

168. In their day-to-day operations, the Debtors heavily rely on many suppliers and service providers. Because the Debtors' primary product is produced from live poultry grown for consumption, the Debtors particularly rely on constant access to products such as corn, soybean meal, and other ingredients used to produce chicken feed. The Debtors also rely on the services of independent sales brokers that have developed relationships with the Debtors' customers and that have agreed to perform services selling the Debtors' products to such customers. The Debtors believe that the goods and services supplied by such suppliers and service providers are critical to their operations in that their businesses, or some arm of their businesses, could not continue to operate without access to such goods and services. As of the Petition Date, many of these suppliers and service providers have outstanding claims against the Debtors arising from prepetition deliveries of goods and prepetition performance of services. Nonpayment of such claims could jeopardize the Debtors' access to such critical goods and services.

169. Accordingly, the Debtors seek authority to pay, in their discretion, certain Feed Ingredient Supplier Obligations and Sales Broker Obligations. In exchange for payment by the Debtors of any Feed Ingredient Supplier Obligation, the Debtors intend to require each Feed Ingredient Supplier to agree to supply the Debtors, for such duration of time as agreed between the Debtors and such Feed Ingredient Supplier, on Customary Trade Terms, unless agreed to otherwise by the Debtors and such Feed Ingredient Supplier. Additionally, the Debtors are seeking authority to pay the Sales Broker Obligations in the ordinary course as they come due.

### (i)     The Feed Ingredient Suppliers

170.     On a weekly basis, the Debtors feed their 18 to 19 million chickens over 435,000 bushels of corn and over 3,200 tons of soybean meal, which together make up the primary ingredients of the Debtors' chicken feed. The Debtors' suppliers of corn, soybean meal, and other feed additives and micro-ingredients used to produce chicken feed (the "Feed Ingredients") are both companies and individual farmers (the "Feed Ingredient Suppliers"). The Debtors believe that their relationships with the Feed Ingredient Suppliers are critical to their businesses. The Debtors' chickens, from which they produce virtually all of their products and on which their businesses depend, are living animals and must be fed. The process of efficiently growing chickens from which the Debtors may produce chicken meat of the quality and weight required by their customers is delicate and highly technical. An interruption in the steady supply of Feed Ingredients would disrupt the highly-engineered process of feeding the Debtors' chickens and would jeopardize the Debtors' inventory of chickens for months to come. The Feed Ingredient Suppliers are generally paid on terms ranging from 10 – 30 days from the delivery of the Feed. Approximately 80% of the Feed Ingredient Suppliers are paid within 20 days of receipt.

171.     In many instances, the Debtors believe that efforts to find alternative suppliers of Feed Ingredients at the Debtors' required volume could cause the Debtors to incur significant additional cost or could take several weeks, resulting in a paralyzing – and deadly – interruption in the Debtors' supply of feed for their chickens.

172.     The Debtors believe that nonpayment of the prepetition claims of Feed Ingredient Suppliers could, in many instances, cause a disruption in their future supply of grain. Specifically, the Debtors are concerned that many of their Feed Ingredient Suppliers may refuse to continue to do business with the Debtors if their prepetition claims are not paid. The Feed

Ingredient Suppliers are essential to the Debtors' ability to maintain the health of their chickens, and thereby their businesses.

173. In addition, the Debtors are particularly concerned that nonpayment could cause many of their Feed Ingredient Suppliers that are individual farmers severe financial hardship and potentially cause some of such suppliers to close their doors, thus causing a loss of supply to the Debtors.

174. As of December 19, 2010, the Debtors owed approximately $11,000,000 to their Feed Ingredient Suppliers (the "Feed Ingredient Supplier Obligations"). The Debtors believe that the cost of paying as much of the Feed Ingredient Supplier Obligations as is necessary to ensure product flow is outweighed by the harm that would result if the Debtors' supply of chicken feed were disrupted.

**(ii)** **The Sales Brokers**

175. The Debtors use the services of independent sales brokers (the "Sales Brokers") to sell the Debtors' products. The Sales Brokers perform a sales representatives or account manager function. Accordingly, without the Sales Brokers, the Debtors would have to hire additional employee to fulfill these functions.

176. The particular Sales Brokers utilized by the Debtors were chosen for their unique and often longstanding relationships with the Debtors' customers and potential customers. The Sales Brokers have initiated the Debtors' relationships with, and now procure sale orders with, some of the Debtors' largest customers and they maintain those customer relationships in exchange for sales commissions. In almost all instances where a Sales Broker's services are involved, the sale of the Debtors' products would not occur absent the Sales Broker's services. In many such instances, a Sales Broker is the Debtors' only contact with their customers. Therefore, a sudden loss of the Sales Broker would very likely cause immediate,

significant damage to the Debtors' relationships with certain customers and even complete loss of certain customers.

177.     The Sales Brokers are generally paid monthly, and the Debtors' next payment to the Sales Brokers for their services for the past month is scheduled for December 23, 2010.   If the Debtors lack authority to make payments in the ordinary course to their Sales Brokers on this next payday, the Debtors' businesses will be exposed to immediate and irreparable harm because it is very likely that many Sales Brokers will stop providing services to the Debtors and will seek new business from the Debtors' competitors.[20]

178.     As of December 8, 2010, the accrued and outstanding commissions to the Sales Brokers (the "Sales Broker Obligations") total approximately $850,000.   The Debtors believe that the cost of honoring the Sales Broker Obligations is significantly outweighed by the long term value the Debtors would secure for their estates by maintaining their relationships with the Sales Brokers and hence, the customer relationships and sales orders that such Sales Brokers procure.   The Debtors perceive no alternative to paying the Sales Brokers' prepetition claims.   If not authorized to pay the Sales Broker Obligations, in their discretion, the Debtors fear that their ability to retain such Sales Brokers will be significantly reduced, and consequently their ability to reorganize will be seriously hampered, thereby causing their estates irreparable harm.

179.     By this Motion, the Debtors propose to condition the payment of the Feed Ingredient Suppliers Obligations on the agreement of the individual Feed Ingredient Supplier to

---

[20]     Although the Debtors have contracts with most of their Sales Brokers, the Debtors believe the relief requested herein is necessary.  Although the Debtors anticipate that they may assume many of their contracts with the Sales Brokers, they have not yet completed the process of reviewing every contract.  To avoid irreparably damaging their relationships with their Sales Brokers, the Debtors seek authority to honor the Sales Broker Obligations (as defined below) in the ordinary course until such time as informed decisions may be made as to whether to assume or reject their contracts with the Sales Brokers.  To the extent the contracts with the Sales Brokers are assumed, payment of the Sales Broker Obligations now is merely an issue of timing.

continue supplying Goods to the Debtors on terms that are as or more favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Feed Ingredient Supplier and the Debtors in the six months prior to the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Feed Ingredient Suppliers. The Debtors reserve the right to negotiate new trade terms with any Feed Ingredient Suppliers as a condition to payment of any Feed Ingredient Supplier Obligation.

180.     For those Feed Ingredient Suppliers who have agreed to provide Goods or Services to the Debtors on terms different from their Customary Trade Terms, the Debtors reserve the right to seek written acknowledgment of such terms on a case-by-case basis. Nothing in this Motion or any order of this Court approving this Motion should be construed as a waiver by any of the Debtors of their rights to contest any invoice of a Feed Ingredient Supplier under applicable non-bankruptcy law.

181.     If a Feed Ingredient Supplier refuses to supply Goods to the Debtors on Customary Trade Terms following payment of any portion of its Feed Ingredient Supplier Obligation, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors hereby seek authority to, in their discretion and without further order of the Court, (a) declare that any Trade Agreement between the Debtors and such Feed Ingredient Supplier is terminated (if applicable) and (b) declare that any payments made to such Feed Ingredient Supplier on account of its Feed Ingredient Supplier Obligation, whether pursuant to a Trade Agreement or otherwise, be deemed to have been in payment of then-outstanding postpetition claims of such Feed Ingredient Supplier without further order of the Court.

182.     In the event the Debtors exercise either of the rights set forth in the preceding paragraph, the Debtors request that the Feed Ingredient Supplier against which the

Debtors exercise such rights be required to immediately return to the Debtors any payments made on account of its Feed Ingredient Supplier Obligation to the extent that such payments exceed the postpetition amounts then owed to such Feed Ingredient Supplier, without giving effect to any rights of setoff or reclamation. In essence, the Debtors seek to return the parties to their respective positions immediately prior to entry of the Order in the event a Trade Agreement is terminated or a Feed Ingredient Supplier refuses to supply Goods to the Debtors on Customary Trade Terms or other terms acceptable to the Debtors following payment of any portion of its Feed Ingredient Supplier Obligation.

**L.** **Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 363, 364, 503(b), 1107(a) And 1108 And Fed. R. Bankr. P. 6003 And 6004 Authorizing The Debtors To (I) Honor Prepetition Obligations To And (II) Continue Prepetition Practices With Certain Critical Vendors**

183. By this Motion, the Debtors seek the entry of an Order authorizing, but not directing, on an emergency basis, the Debtors to (i) pay certain undisputed prepetition obligations of vendors critical to the Debtors' operations (the "<u>Critical Vendors</u>") and (ii) continue during the postpetition period their prepetition practices with certain Critical Vendors.

**(i)** **The Critical Vendor Claims**

184. In their day-to-day operations, the Debtors heavily rely on many suppliers and service providers. Like many large manufacturing companies, the Debtors rely on vendors such as the manufacturers and servicers of equipment for their factories and the suppliers of the custom-made packaging materials they use to ship products to their customers.

185. The Debtors were able to distinguish, from the several thousands of vendors with whom the Debtors deal, a small group of vendors that the Debtors deem to be Critical Vendors. These vendors provide goods and services to the Debtors necessary to keep their chickens healthy and alive and their plants operating, such as vaccines, employee supplies

and sanitation services required by the United States Department of Agriculture (the "U.S.D.A."), dry ice used to store and transport the Debtors' processed poultry and plant equipment used to process their chicken products. In addition, the Critical Vendors provide products to the Debtors necessary to enable the Debtors to retain the business of important customers, such as customer-specified ingredients used to produce prepared poultry products. Many of the Critical Vendors are either sole-source suppliers or are the only vendors able to meet the Debtors' volume requirements such that it would take weeks to months for the Debtors to find alternate suppliers or service providers. In addition, many of the Critical Vendors are small companies and any one payment by the Debtors represents a significant portion of their income.

186. The Debtors believe that the goods and services supplied by certain of their vendors are critical to their operations in that their businesses, or some arm of their businesses, could not continue to operate without access to such goods and services. Certain of the Critical Vendors have claims for essential raw materials, parts, components, and sourced and other goods (the "Goods") provided to the Debtors that were received by the Debtors before the Petition Date.21 The Debtors estimate that, as of the Petition Date, the total outstanding amount owed to the Critical Vendors is approximately $3,800,000 (the "Critical Vendor Claims").

187. If the Debtors are unable to honor these obligations, the Debtors face the real possibility that the Critical Vendors may refuse to continue to deliver Goods to the Debtors - Goods essential to the operation of the Debtors' business and critical to maintaining the going-

---

[21] These Goods may include both those Goods that were received by the Debtors within the twenty day period prior to the Petition Date, which are entitled to priority status under section 503(b)(9) of the Bankruptcy Code, and those Goods that were received by the Debtors prior to the twenty day period before the Petition Date, which are not entitled to priority status under section 503(b)(9) of the Bankruptcy Code.

concern value of the Debtors' business and assets pending a sale. Moreover, certain of the Critical Vendors rely heavily upon their business relationship with the Debtors. If the Debtors fail to honor their Critical Vendor Claims, these Critical Vendors may be forced to cease their own operations, thereby eliminating critical and, in some circumstances, exclusive sources of certain Goods for the Debtors—a result that would have a significant negative impact on the Debtors' operations and efforts to maximize the value of their business and assets pending a sale.

188.    By this Motion, the Debtors respectfully request the entry of an order authorizing, but not directing, the Debtors, in their business judgment and sole discretion, to (a) pay the Critical Vendor Claims in an aggregate amount not to exceed $3,800,000 (the "Critical Vendor Cap")[22] and (b) continue during the postpetition period their prepetition practices with the Critical Vendors.[23]

189.    Additionally, the Debtors seek an order authorizing all banks and other financial institutions to receive, process, honor and pay any and all checks presented for payment and electronic transfers with respect to payments authorized by this Motion, whether presented before or after the Petition Date, upon receipt by each bank and financial institution of notice of such authorization, provided that sufficient funds are on deposit in the applicable accounts to cover such payments.

---

[22]    The Debtors conduct a portion of their business with the Critical Vendors through the payment of invoices by check. The Debtors have endeavored to determine which of the checks issued to the Critical Vendors have yet to be honored, and to the best of their ability, such amounts are included in their request for authority to pay, in their discretion, the Critical Vendor Claims. However, the Debtors reserve the right to seek to increase the Critical Vendor Cap at a later date if necessary, subject to this Court's approval, for this or any other reason.

[23]    Nothing herein is intended or should be construed as (a) an admission as to the validity or priority of any claim against the Debtors, (b) a waiver of the Debtors' rights to dispute any claim, including the validity or priority thereof, or (c) an approval or assumption of any agreement, contract or lease whether under section 365(a) of the Bankruptcy Code or otherwise. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

190. The Debtors propose to condition the payment of the Critical Vendor Claims on the agreement of the individual Critical Vendor to continue supplying Goods to the Debtors on terms that are as or more favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and the Debtors in the six months prior to the Petition Date (the "Customary Trade Terms"), or such other trade terms as are agreed to by the Debtors and the Critical Vendor. The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

191. For those Critical Vendors who have agreed to provide Goods to the Debtors on terms different from their Customary Trade Terms, the Debtors reserve the right to seek written acknowledgment of such terms on a case-by-case basis. Nothing in this Motion or any order of this Court approving this Motion should be construed as a waiver by any of the Debtors of their rights to contest any invoice of a Critical Vendor under applicable non-bankruptcy law.

192. If a Critical Vendor refuses to supply Goods to the Debtors on Customary Trade Terms following payment of any portion of its Critical Vendor Claim, or fails to comply with any Trade Agreement it entered into with the Debtors, the Debtors hereby seek authority to, in their discretion and without further order of the Court, (a) declare that any Trade Agreement between the Debtors and such Critical Vendor is terminated (if applicable) and (b) declare that any payments made to such Critical Vendor on account of its Critical Vendor Claim, whether pursuant to a Trade Agreement or otherwise, be deemed to have been in payment of then-outstanding postpetition claims of such Critical Vendor without further order of the Court.

193. In the event the Debtors exercise either of the rights set forth in the preceding paragraph, the Debtors request that the Critical Vendor against which the Debtors

exercise such rights be required to immediately return to the Debtors any payments made on account of its Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owed to such Critical Vendor, without giving effect to any rights of setoff or reclamation. In essence, the Debtors seek to return the parties to their respective positions immediately prior to entry of the Order in the event a Trade Agreement is terminated or a Critical Vendor refuses to supply Goods to the Debtors on Customary Trade Terms or other terms acceptable to the Debtors following payment of any portion of its Critical Vendor Claim.

**M.    Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 363, 364, 503(b), 1107(a) And 1108 And Fed. R. Bankr. P. 6003 And 6004 Authorizing The Debtors To Honor Prepetition Obligations To Growers**

194.    By this Motion, the Debtors seek the entry of an Order authorizing, but not directing, the Debtors to honor prepetition obligations to the independent contractor growers that raise the Debtors' chickens.

195.    In addition to the poultry processing arms of their businesses, the Debtors, in the ordinary course of business, raise chickens for slaughter. Specifically, the Debtors purchase chicks, called "pullets," and deliver them to grow-out farms to be raised to become breeder hens and roosters. Once pullets reach approximately 22-23 weeks of age, they are moved to Growers at breeding farms who care for and tend to the breeding stock during their productive egg laying period though approximately 65 weeks of age.

196.    Broiler eggs laid at breeder farms are delivered to hatcheries to be incubated for twenty-one days at which time the chicks hatch and are assigned and delivered to broiler grow-out farms. At the broiler grow-out farms, chicks are raised for six to ten weeks depending on the desired size of the broiler. When broiler chickens reach full growth, they are caught and delivered to processing plants.

197.    The Debtors rely primarily on the services of approximately 339 independent contract growers, which are comprised of approximately 52 pullet/breeder growers, and 287 broiler growers, having approximately 1,200 chicken houses, to raise and care for the Debtors' chickens.  Specifically, the Debtors enter into contractual growing arrangements (the "Growing Arrangements") with individuals with whom they contract to (i) raise chicks to become breeder hens and roosters (the "Pullet Growers"), (ii) raise and care for the Debtors' breeding stock (the "Breeder Growers"), and (ii) raise and care for the Debtors' broiler chickens (the "Broiler Growers," and, together with the Pullet Growers and Breeder Growers, the "Growers").   As of the Petition Date, the Growers were in possession of approximately 18-19 million of the Debtors' live chickens.

198.    The Growers are independent contractors.   Pursuant to the typical Growing Arrangements, the Growers own and operate the farm, chicken houses, equipment, utilities and labor required to raise and care for the Debtors' chickens, while the Debtors provide the live poultry as well as feed, veterinary services, technical assistance, and the Debtors' recommendations as to the technical aspects of efficiently growing, feeding and caring for the chickens.  In almost all cases, the Growers are independent farmers who raise poultry solely for the Debtors.

199.    As of the December 8, 2010, there was an aggregate outstanding amount due the Growers in the amount of approximately $4.7 million.   (collectively, the "Grower Obligations").

200.    It is critical to the Debtors' businesses that their live chickens receive proper care.  Were the Growers to stop caring for the Debtors' chickens, the Debtors' inventories would be diminished for months.  The Debtors would be unable to meet customer expectations

and their customers would quickly find alternative suppliers. Once a customer switches to a competitor, the Debtors may not regain that customer's business for an extended period of time, if at all. In addition, many of the Debtors' major customers regularly audit the Debtors for their compliance with industry standards for animal welfare. Any interruption in proper care of the Debtors' birds by the Growers, as well as any publicity generated by such interruption, could endanger important relationships with the Debtors' customers.

201. A failure to pay the Growers may result in an inability or unwillingness of the Growers to care for the Debtors' chickens that are currently in such Growers' possession. Many of the Growers with claims against the Debtors arising from prepetition services continue to be in possession of the Debtors' chickens postpetition. Further, the farms of the Growers are typically small, family-run organizations, many of which are subject to mortgages and other expenses that must be paid monthly or on a flock-by-flock basis. Many, if not all, of the Growers would face severe financial hardship were the Debtors not authorized to pay the prepetition amounts owed to such Growers, and many may face foreclosure actions by secured lenders and/or be forced to shut down operations due to lack of resources. Such action would endanger the Debtors' chickens that are currently in such Growers' possession.

202. In addition, if the Debtors' Growers terminate or suspend their services, the Debtors could not find replacement growers in a reasonable time because most existing non-affiliated Growers in the Debtors' complex areas are already contracted with other poultry producers. The Debtors' currently contracted base of Growers is extremely valuable to the Debtors because it has taken many years to develop this base of Growers to its current level. The current Growers' farms are already properly equipped to raise and care for the Debtors' birds. If the Debtors were left with no other option but to enlist the assistance of new Growers, valuable

time and expense would be lost in finding and training new Growers and helping them build their facilities.

203.    If the Debtors do not pay the Growers, it is possible that the Growers would refuse to deliver the flocks of chickens or other poultry to the Debtors that are currently in their possession and would assert possessory or similar liens against such chickens.

204.    In sum, a failure to pay the Growers could cause the Growers to stop caring for the Debtors' birds, and thereby impose enormous time and cost burdens on the Debtors, jeopardize future sources of revenue for months to come, and compromise the Debtors' investment of time and money in the flocks currently progressing through growing and breeding cycles.

**N.    Motion Of Debtors For Orders (A) Authorizing Debtors (I) To Obtain Post-Petition Financing And Granting Security Interests And Superpriority Administrative Expense Status Pursuant To 11 U.S.C. § 364; (II) To Use Cash Collateral Pursuant To 11 U.S.C. § 363; (III) To Provide Adequate Protection Pursuant To 11 U.S.C. § 361; And (B) Scheduling A Final Hearing And Establishing Related Notice Requirements**

205.    By this Motion, the Debtors seek the entry of interim and final orders, *inter alia*,

> (i) approving a term sheet (the "<u>DIP Term Sheet</u>") that outlines the principal terms for a senior secured superpriority debtor-in-possession credit facility on a superpriority and priming basis, which DIP Financing shall consist of (a) loans up to $12 million to fund operations, pay the Carve-Out (as defined below) and other administrative expenses (the "<u>New Money DIP Loan</u>") and (b) a loan of up to $40 million to refinance the revolving portion of the Pre-Petition Obligations (as defined below) (the "<u>Replacement DIP Loan</u>" and together with the New Money DIP Loan, the "<u>DIP Loans</u>") (the DIP Term Sheet, as may be memorialized in a definitive credit agreement and related documents and instruments, as may be amended, supplemented or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), by and among the Debtors, and the lenders under the Credit Agreement dated as of April 25, 2007 (as amended from time to time, and together with all related loan and security documents, the "<u>Pre-Petition Credit</u>

Agreement"), by and among the Debtors, Wilmington Trust Company ("Wilmington Trust"), as administrative agent and facility agent (the "Pre-Petition Bank Group Agent"), and the lenders from time to time party thereto (the "Pre-Petition Bank Group Lenders"), who agree to participate from time to time party thereto (the "DIP Lenders"), and Wilmington Trust, as administrative and collateral agent (in such capacity, the "Administrative Agent"), substantially in the form of **Exhibit "A"** annexed to the proposed interim order (the "Interim Order", a proposed form of which is attached to this Motion as **Exhibit A**;

(ii) authorizing the Debtors to execute and deliver the DIP Term Sheet and the other related credit documents (the "DIP Documents") by and among the Borrowers and the Administrative Agent, and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii) allowing superpriority administrative expense claim status for all obligations owing under the DIP Documents to the Administrative Agent and the DIP Lenders (collectively, and including all "Obligations" as described in the DIP Term Sheet, the "Post-Petition Obligations");

(iv) granting to the Administrative Agent, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens upon all of the Collateral, including, without limitation, all property constituting "Cash Collateral," as defined in Section 363(a) of the Bankruptcy Code, as set forth herein;

(v) authorizing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, without limitation, closing fees and the reasonable fees and disbursements of the attorneys, advisers, accountants, and other consultants of the Administrative Agent and the DIP Lenders, all to the extent provided in and in accordance with the terms of the DIP Documents;

(vi) authorizing the use of Cash Collateral and providing adequate protection to the Pre-Petition Bank Group Agent and Pre-Petition Bank Group Lenders for any Diminution in Value of their interests in the Prepetition Collateral (as defined in the DIP Term Sheet), including the Cash Collateral;

(vii) vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order, as limited pursuant hereto; and

(viii) scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and a final order approving the relief requested in this Motion (the "Final Order") and approving the form of notice with respect to the Final Hearing

206.    The Debtors have insufficient cash to finance their operations, maintain business relationships with their vendors, suppliers, and customers, and to pay their employees.

207.    Other than the DIP Credit Agreement, there are no viable financing alternatives available to it under the circumstances.  The Debtors have been exploring financial alternatives for at least two years and are intimately familiar with the lack of financing available to them.  In fact, the Debtors retained an investment banker to seek alternative financing and it was unable to obtain any on terms as favorable as those contained in the proposed DIP financing.

208.    Given the encumbrances upon substantially all of the Debtors' assets and the severely restricted borrowing base under the Pre-Petition Credit Agreement, the Debtors urgently need credit and additional capital to continue their businesses and operations.  Absent immediate availability of new credit, the Debtors' will be forced to cease operations and the going-concern value of their business will be lost.

209.    Accordingly, the Debtors require the availability of working capital from the DIP Credit Agreement and the use of cash collateral.  The DIP Credit Agreement will provide more than just the necessary cash for the Debtors to operate their business, the facility will instill a sense of confidence in the Debtors' employees, customers, vendors, and other important stakeholders.  The Debtors' critically need the support of these stakeholders at this time, as the loss of their support could severely impair the Debtors' ability to maximize the value of their estates.

210.    In sum, without the immediate access to post-petition financing, the Debtors expect to suffer an acute cash shortage that would immediately and irreparably harm

their estates and creditors. Furthermore, the Debtors lack sufficient funds to meet expenses necessary for the continued operation of their business before the Final Hearing on the DIP Motion can be held, and, therefore, it is essential that the Debtors obtain interim financing provided by the DIP Credit Agreement. The Debtors' ability to remain viable and preserve the value of the Debtors' estates for the benefit of their creditors depends upon the interim and final relief requested in the DIP Motion.

**O.     "Second Day Relief" and Applications to Retain Professionals**

211.    On or soon after the Petition Date, in addition to the foregoing requests for relief, the Debtors intend to file: (a) motions seeking authority to, among other things, (i) retain and employ ordinary course professionals, (ii) establish interim compensation procedures for professionals and official committee members, (ii) seek an extension of time to file their schedules and statements; and (b) applications to retain (i) Morris, Nichols, Arsht & Tunnell LLP as Debtors' counsel, (ii) McKenna, Long and Aldridge LLP as special counsel to the Debtors, (iii) Dalton T. Edgecomb of Huron Consulting Services LLC as Chief Restructuring Officer to the Debtors and additional personnel provided by Huron Consulting Services LLC, and (iv) SSG Advisors as investment bankers for the Debtors

## V.     CONCLUSION

212.    The Debtors' ultimate goal in these chapter 11 cases is to maximize the value of their estates for the benefit of their creditors. To minimize any loss of value of the Debtors' business during the Debtors' transition into chapter 11, the Debtors' immediate objective is to engage in business as usual with as little interruption or disruption to operations as the Debtors evaluate all of their strategic options. I believe that, if the Court grants the First Day Relief, the Debtors' prospects for achieving their overriding goal of maximizing value will be substantially enhanced.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 19th day of December, 2010, at Georgetown, Delaware

_____
GEORGE C. WHITE

*[Signature Page for Declaration of George C. White In Support of First Day Motions]*