## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TOWNSENDS, INC., *et al.*,[1] | ) | Case No. 10-14092 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Pending) |
| | ) | |
| | ) | |

## MOTION OF DEBTORS FOR ORDERS (A) AUTHORIZING DEBTORS (I) TO OBTAIN POST-PETITION FINANCING AND GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. § 364; (II) TO USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (III) TO PROVIDE ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. § 361; AND (B) SCHEDULING A FINAL HEARING AND ESTABLISHING RELATED NOTICE REQUIREMENTS

Townsends, Inc., Townsend Farms, Inc., Townsends of Arkansas, Inc., Townsend Farms of Arkansas, Inc., and Crestwood Farms LLC (the "Borrowers"), each as a debtor and debtor-in-possession (collectively, the "Debtors") in the above-captioned cases (collectively with any successor cases, the "Cases") hereby move (the "DIP Motion"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of interim and final orders, inter alia,

(i) approving a term sheet (the "DIP Term Sheet")[2] that outlines

---

[1] The Debtors, followed by the last four digits of their respective taxpayer identification numbers, are as follows: Townsends, Inc. (0681); Townsend Farms, Inc. (5263); Townsends of Arkansas, Inc. (5644); Townsend Farms of Arkansas, Inc. (0027); and Crestwood Farms LLC (7388) c/o 22855 DuPont Boulevard, Georgetown, DE 19947.

[2] Unless otherwise defined herein, all capitalized terms used herein have the meanings ascribed to such terms in the Interim Order or DIP Term Sheet. To the extent that there is any conflict between the definitions contained in either the Interim Order or the DIP Term Sheet, the definitions in the DIP Term Sheet shall

the principal terms for a senior secured superpriority debtor-in-possession credit facility on a superpriority and priming basis, which DIP Financing shall consist of (a) loans up to $12 million to fund operations, pay the Carve-Out (as defined in the DIP Term Sheet) and other administrative expenses (the "New Money DIP Loan") and (b) a loan of up to $40 million to refinance the revolving portion of the Pre-Petition Obligations (as defined below) (the "Replacement DIP Loan" and together with the New Money DIP Loan, the "DIP Loans") (the DIP Term Sheet, as may be memorialized in a definitive credit agreement and related documents and instruments, as may be amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), by and among the Debtors, and the lenders under the Credit Agreement dated as of April 25, 2007 (as amended from time to time, and together with all related loan and security documents, the "Pre-Petition Credit Agreement"), by and among the Debtors, Wilmington Trust Company ("Wilmington Trust"), as administrative agent and facility agent (the "Pre-Petition Bank Group Agent"), and the lenders from time to time party thereto (the "Pre-Petition Bank Group Lenders"), who agree to participate from time to time party thereto (the "DIP Lenders"), and Wilmington Trust, as administrative and collateral agent (in such capacity, the "Administrative Agent"), substantially in the form of **Exhibit "A"** annexed to the proposed interim order (the "Interim Order", a proposed form of which is attached hereto as **Exhibit A**;

(ii) authorizing the Debtors to execute and deliver the DIP Term Sheet and the other related credit documents (the "DIP Documents") by and among the Borrowers and the Administrative Agent, and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii) allowing superpriority administrative expense claim status for all obligations owing under the DIP Documents to the Administrative Agent and the DIP Lenders (collectively, and including all "Obligations" as described in the DIP Term Sheet, the "Post-Petition Obligations");

(iv) granting to the Administrative Agent, for the benefit of itself and the DIP Lenders, automatically perfected security interests in and liens upon all of the Collateral, including, without limitation, all property constituting "Cash Collateral," as defined in Section 363(a) of the Bankruptcy Code, as set forth herein;

control.

(v) authorizing the Debtors to pay the principal, interest, fees, expenses, and other amounts payable under the DIP Documents as such become due, including, without limitation, closing fees and the reasonable fees and disbursements of the attorneys, advisers, accountants, and other consultants of the Administrative Agent and the DIP Lenders, all to the extent provided in and in accordance with the terms of the DIP Documents;

(vi) authorizing the use of Cash Collateral and providing adequate protection to the Pre-Petition Bank Group Agent and Pre-Petition Bank Group Lenders for any diminution in value of their interests in the Prepetition Collateral (as defined in the DIP Term Sheet), including the Cash Collateral;

(vii) vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order, as limited pursuant hereto; and

(viii) scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and a final order approving the relief requested in this Motion (the "Final Order") and approving the form of notice with respect to the Final Hearing.

In support of the DIP Motion, the Debtors, by and through their undersigned counsel, respectfully represent:

## JURISDICTION

1.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code.

## BACKGROUND

3.      On December 19, 2010 (the "Petition Date"), the Debtors commenced their respective bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. No trustee, examiner or creditors' committee has been appointed in these

cases. The Debtors are operating their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.     The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the Declaration of George C. White in Support of First Day Motions (the "White Declaration") filed contemporaneously herewith and incorporated herein by reference.

## SUMMARY OF THE DEBTORS' PREPETITION SECURED INDEBTEDNESS

### *Loan and Security Agreement*

5.     The Debtors are party to that certain Loan and Security Agreement dated as of April 25, 2007 (as amended from time to time, the "Loan Agreement"), by and among the Debtors, Wilmington Trust Company (individually and in its capacity as administrative and collateral agent for the Bank Group (as defined below), "WTC"), Greenstone Farm Credit Services, ACA/FLCA ("Greenstone"), Agstar Financial Services, PCA ("Agstar"), and PNC Bank, N.A. (as successor to Mercantile Peninsula Bank, "PNC" each a lender and collectively with WTC, Greenstone and Agstar, the "Bank Group"). Pursuant to the Loan Agreement, the Bank Group made available to the Debtors a revolving line of credit (the "Revolver") to be used for business operations and certain term loan facilities (collectively, the "Term Loan") the proceeds of which were used to refinance then existing indebtedness and to back certain letters of credit.

6.     As of the Petition Date, the aggregate outstanding principal and accrued interest under the Loan Agreement is approximately $20.7 million (plus $12,085,417.00 in commitments with respect to letters of credit) with regard to the Term Loan and approximately $40.0 million with regard to the Revolver.

7.     To secure the Revolver and the Term Loan (including the commitments with respect to letters of credit), the Debtors granted the Bank Group first priority liens, mortgages and security interests in substantially all of the Debtors' assets, including without limitation, accounts, raw materials, farm products, receivables, real property, rents and personal property.

### *Amended and Restated Note Purchase Agreement*

8.     Additionally the Debtors are a party to that certain Amended and Restated Note Purchase Agreement dated as of June 13, 2005 (as amended, the "Note Purchase Agreement"), by and among the Debtors, John Hancock Life Insurance Company (U.S.A.) (as successor by merger to John Hancock Life Insurance Company and John Hancock Variable Life Insurance Company), John Hancock Insurance Company of Vermont and John Hancock Life & Health Insurance Company (formerly known as Manulife Insurance Company, collectively with the other John Hancock parties, the "Noteholders"), as amended from time to time.  Under the Note Purchase Agreement, the Debtors issued 8.44% notes due June 1, 2013 (the "Notes") to the Noteholders.

9.     As of the Petition Date, the aggregate principal and accrued interest under the Note Purchase Agreement was $8.3 million.

10.    To secure the indebtedness under the Notes, the Debtors granted the Noteholders liens on and a security interests in substantially all of the Debtors' assets.

### *Intercreditor Agreement*

11.    Pursuant to that certain Intercreditor and Collateral Agency Agreement dated April 25, 2007 (the "Intercreditor Agreement"), by and among John Hancock Life Insurance Company (U.S.A.) (as collateral agent for the Noteholders under the Note Purchase

Agreement), the Noteholders, WTC (as administrative and collateral agent for the Bank Group under the Loan Agreement and as collateral agent for the Bank Group and the Noteholders under the Intercreditor Agreement), and the Bank Group, certain collateral of the Debtors is secured on a *pari passu* basis for the benefit of the Bank Group and the Noteholders.

### *Forbearance*

12.     On or about November 30, 2008, the Debtors advised the Bank Group that the Debtors had failed to comply with certain financial covenants under the Loan Agreement and the Debtors requested the Bank Group, and the Bank Group agreed, to, among other things, forbear from exercising the Bank Group's rights and remedies under the Loan Agreement through and including December 31, 2008 (as extended, the "Forbearance Period") pursuant to the terms and conditions of that certain Forbearance and Amendment to Loan Documents Agreement dated as of November 30, 2008 (as amended, the "Forbearance Agreement"), by and among the Debtors and the Bank Group, and acknowledged by the Noteholders.  The Bank Group agreed to extend the Forbearance Period through and including February 28, 2009 pursuant to the terms and conditions of that certain First Amendment to the Forbearance Agreement dated as of December 31, 2008.  The Bank Group agreed to extend the Forbearance Period through and including April 30, 2009 pursuant to the terms and conditions of that certain Second Amendment to the Forbearance Agreement dated as of February 28, 2009.

13.     On or about April 30, 2009, the Debtors notified the Noteholders that the Debtors had failed to comply with certain financial covenants under the Note Purchase Agreement and the Debtors requested the Noteholders to, among other things, forbear from exercising their rights and remedies under the Note Purchase Agreement.  The Bank Group agreed to extend the Forbearance Period, and the Noteholders agreed to forbear from exercising

their rights and remedies under the Note Purchase Agreement, through and including April 25, 2010 pursuant to the terms and conditions of that certain Third Amendment to the Forbearance Agreement dated as of April 30, 2009. The Bank Group and the Noteholders agreed to extend the Forbearance Period through and including October 25, 2010 pursuant to the terms and conditions of that certain Fourth Amendment to the Forbearance Agreement dated as of April 25, 2010 (the "Fourth Amendment"). The Bank Group agreed to extend the Forbearance Period through and including 12:00 noon (Eastern Time) on the Petition Date pursuant to the terms and conditions of certain modifications to the Fourth Amendment. The Noteholders agreed to extend the Forbearance Period through and including 12:00 noon (Eastern Time) November 19, 2010 pursuant to the terms and conditions of certain modifications to the Fourth Amendment but have not extended beyond this time period.

14. As a condition to entering into the Fourth Amendment, the Bank Group and the Noteholders required The Indian River Trust, the sole shareholder of Townsends, to pledge its interest in Townsends pursuant to the terms and conditions of that certain Non-Recourse Guaranty, Pledge and Security Agreement dated as of April 25, 2010, by and between The Indian River Trust and WTC (in its capacity as collateral agent for the Bank Group and the Noteholders under the Intercreditor Agreement). In addition, as a condition to entering into the Fourth Amendment, the Bank Group and the Noteholders required Townsends to pledge its interest in Townsend Farms, Inc., Townsends of Arkansas, Inc. and Crestwood Farms LLC pursuant to the terms and conditions of that certain Pledge and Security Agreement dated as of April 25, 2010, by and between Townsends and WTC (in its capacity as collateral agent for the Bank Group and the Noteholders under the Intercreditor Agreement). Further, as a condition to entering into the Fourth Amendment, the Bank Group and the Noteholders required Townsends

of Arkansas, Inc. to pledge its interest in Townsend Farms of Arkansas, Inc. pursuant to that certain Pledge and Security Agreement dated as of April 25, 2010, by and between Townsends of Arkansas, Inc. and WTC (in its capacity as collateral agent for the Bank Group and the Noteholders under the Intercreditor Agreement).

### *Industrial Revenue Bonds and Letters of Credit*

15. The Chatham County Industrial Facilities and Pollution Control Financing Authority ("The Chatham County Authority") issued certain industrial revenue bonds on September 1, 2001 (the "Chatham County Revenue Bonds"), the proceeds of which were made available to Townsends to fund construction of certain facilities in Chatham County, North Carolina pursuant to the terms and conditions of that certain Loan Agreement dated September 1, 2001 (the "Chatham County Loan Agreement"), by and between Townsends and The Chatham County Authority.

16. As of the Petition Date, the aggregate principal and accrued interest under the Chatham County Loan Agreement is approximately $2.9 million.

17. WTC issued an Irrevocable Letter of Credit dated September 19, 2001 (as amended, the "Chatham County Letter of Credit") in the amount of $2,960,417 to U.S. Bank (as successor trustee to First Union National Bank under the Chatham County Revenue Bonds trust indenture) for the account of Townsends, to back Townsends' obligations under the Chatham County Loan Agreement. Drawings under the Chatham County Letter of Credit are backed by a term loan facility under the Loan Agreement.

18. Independence County, Arkansas ("Independence County") issued certain industrial revenue bonds on November 1, 1996 (the "Independence County Revenue Bonds"), the proceeds of which were used by Independence County to purchase certain facilities in

Independence County, Arkansas and to lease such facilities to Townsends of Arkansas, Inc. pursuant to the terms and conditions of that certain Lease Agreement dated as of November 1, 1996 (the "Independence County Lease Agreement"), by and between Townsends of Arkansas, Inc. and Independence County.

19.     As of the Petition Date, the aggregate principal and accrued interest under the Independence County Lease Agreement is approximately $9.2 million.

20.     WTC issued an Irrevocable Letter of Credit dated April 25, 2007 (as amended, the "Independence County Letter of Credit") in the amount of $9,125,000 to U.S. Bank (as trustee under the Independence County Revenue Bonds trust indenture) for the account of Townsends of Arkansas, Inc. to back Townsends of Arkansas, Inc.'s obligations under the Independence County Lease Agreement. The Independence County Letter of Credit is backed by a term loan facility under the Loan Agreement.

### THE DEBTORS' URGENT NEED FOR POST-PETITION FINANCING

21.     As a consequence of the factors described in the White Declaration, the Debtors have insufficient cash to finance their operations, maintain business relationships with their vendors, suppliers, and customers, and to pay their employees.

22.     Given the encumbrances upon substantially all of the Debtors' assets and the severely restricted borrowing base under the Pre-Petition Credit Agreement, the Debtors urgently need credit and additional capital to continue their businesses and operations. Absent immediate availability of new credit, the Debtors' will be forced to cease operations and the going-concern value of their business will be lost.

23.     Accordingly, the Debtors require the availability of working capital from the DIP Lenders and the use of cash collateral. The DIP financing will provide more than just

cash for the Debtors to operate their business, the facility will instill a sense of confidence in the Debtors' employees, customers, vendors, and other important stakeholders. The Debtors' critically need the support of these stakeholders at this time, as the loss of their support could severely impair the Debtors' ability to maximize the value of their estates.

24.    In sum, without the immediate access to post-petition financing, the Debtors expect to suffer an acute cash shortage that would immediately and irreparably harm their estates and creditors. Furthermore, the Debtors lack sufficient funds to meet expenses necessary for the continued operation of their business before the Final Hearing on the DIP Motion can be held, and, therefore, it is essential that the Debtors obtain the proposed interim financing from the DIP Lenders. The Debtors' ability to remain viable and preserve the value of the Debtors' estates for the benefit of their creditors depends upon the interim and final relief requested in the DIP Motion.

## SUMMARY OF THE DEBTORS' PROPOSED DIP FINANCING[3]

25.    The Debtors have determined, in the exercise of their sound business judgment, that to meet their working capital needs they require a post-petition credit facility in substantially the form described herein. Accordingly, subject to the Court's approval, the Debtors have determined to enter into the DIP Term Sheet with the Administrative Agent.

26.    The terms of the DIP financing are more specifically set forth in the DIP Term Sheet attached to the Interim Order as **Exhibit "A".** The key provisions of the DIP Term Sheet are as follows:

---

[3]    The summaries and descriptions of the terms and conditions of the DIP Term Sheet and the proposed Interim Order set forth in the DIP Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Term Sheet and the Interim Order. In the event there is a conflict between the DIP Motion and the DIP Term Sheet or the Interim Order, the DIP Term Sheet or the Interim Order, as applicable, shall control in all respects.

| | |
|---|---|
| **Borrowers:** | Townsends, Inc., Townsend Farms, Inc., Townsends of Arkansas, Inc., Townsend Farms of Arkansas, Inc., and Crestwood Farms LLC. |
| **Lenders:** | The lenders party to the Credit Agreement dated as of April 25, 2007 (Credit Agreement, dated April 25, 2007 (as amended from time to time, and together with all related loan and security documents), by and among Wilmington Trust Company, as administrative agent and facility agent, the lenders from time to time party thereto and the Debtors, who agree to participate from time to time party thereto (the "<u>DIP Lenders</u>"). |
| **Administrative Agent:** | Wilmington Trust Company, as administrative and collateral agent (in such capacity, the "<u>Administrative Agent</u>"). |
| **Loan Facility:** | |
|     Facility Amount: | Senior secured super-priority debtor-in-possession financing in the form of a revolving credit facility of up to US Twelve Million Dollars ($12,000,000) of new borrowings with a rollup of the Forty Million Dollars ($40,000,000) Pre-Petition Revolver. The Administrative Agent and DIP Lenders will advance up to Forty-Seven Million Dollars ($47,000,000.00) (the "<u>Interim Commitment</u>") upon entry of the Interim Order, provided that the Interim Order shall be satisfactory in form and substance to the Administrative Agent, the Required Lenders (as defined herein), the Pre-Petition Bank Group Agent and the Pre-Petition Bank Group Lenders in their sole discretion. <br><br>A copy of the Budget is attached hereto as **Exhibit B**. |
|     Budget: | |
| **Interest Rates:** | Subject to the default rate of interest provision, the DIP Credit Agreement shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to LIBOR plus 6.7 % with a LIBOR floor of 2.5%.  Interest is payable monthly in cash in arrears on the last business day of each calendar month (subject to the Required Lenders' (as defined in the DIP Term Sheet) option to capitalize such as interest). |
| **Default Interest:** | The default rate of interest shall equal the then applicable rate plus 2%. |
| **Term:** | The DIP Loans shall be repaid in full at the earliest of (i) the stated maturity, which shall be 90 days after the Closing Date of the DIP advance under the Interim DIP Order (as defined below) (the "<u>Maturity Date</u>"), (ii) the Termination Date (as defined below), or (iii) March 29, 2011. |
| **Fees:** | <u>Facility Fee</u>. A facility fee (the "<u>Facility Fee</u>") equal to 1.5% of the $12 million of new borrowings under the DIP Credit Agreement.  The Facility Fee will be deemed earned in full on the Closing Date (as defined in the DIP Term Sheet), and shall be payable as follows: (i) 0.5% on the Closing Date and (ii) the remaining 1% payable in three (3) equal installments with each paid on the first business day of each calendar month prior to the Termination Date, with the unpaid portion of the Facility Fee, if any, paid in full on the Termination Date. The Facility Fee may be allocated among the DIP Lenders as they may decide. <br><br><u>Administration Fee</u>. An administration fee (the "<u>Administrative Fee</u>"), payable to the Administrative Agent, in the amount of $5,000.00 per month (or part thereof for the months in which the term of the DIP Loan begins or ends) payable on the Closing Date and on the first day of each calendar month thereafter. |

| | The Facility Fee and Administrative Fees are non-refundable. |
|---|---|
| **Expenses:** | The Borrowers shall pay (i) all reasonable out-of-pocket expenses of the Administrative Agent and DIP Lenders associated with the negotiation, preparation, execution, delivery and administration of the Cases and the DIP Documents and any amendment or waiver with respect thereto (including the fees, disbursements and other charges of counsel), and (ii) all reasonable out-of-pocket expenses of the Administrative Agent and the DIP Lenders (including the fees, disbursements and other charges of counsel) in connection with Cases, including the exercise and enforcement of the rights and remedies of the Administrative Agent and the DIP Lenders under the DIP Documents and applicable law. The Administrative Agent and the DIP Lenders, or their respective counsel, shall provide copies of their respective Invoices (as defined in the DIP Term Sheet) to the Debtors before payment of same shall be made. |
| **Collateral:** | All tangible and intangible property and assets of the Debtors, including, without limitation, all personal property and real property and fixtures, the capital stock, partnership/and member interests and other equity interests of and in each direct and indirect subsidiary of each Borrowers, all promissory notes and other payment intangibles, including all inter-company notes and receivables, real estate, leasehold interests, all cash, investments, securities and other property contained in any account maintained by any Borrowers, all intellectual property, and all proceeds of the foregoing, but excluding the proceeds of all claims and causes of action asserted or prosecuted under chapter 5 of the Bankruptcy Code. The foregoing collateral is collectively referred to as the "DIP Collateral". |
| **Use of Proceeds:** | The DIP Loans shall be available (a) to fund working capital requirements of the Debtors, operating expenses of the Debtors, and other line items in accordance with the terms of the Budget; (b) to fund the payment of cash-pay interest accrued on the DIP Loans; (c) to fund the payment of cash-pay interest accrued on the Pre-Petition Bank Group Lender Debt (as defined in the DIP Term Sheet) (the Term A Loan and the Term B Loan); (d) to pay fees and expenses of the Administrative Agent and the DIP Lenders related to the DIP Facility and the Debtors' chapter 11 cases (the "Cases"), including reasonable attorneys' fees; (e) to pay the fees and expenses of the Pre-Petition Bank Group Agent and the Pre-Petition Bank Group Lenders relating to the Cases, including reasonable attorneys' fees; and (f) subject to the entry of the Final Order, to pay the fees and expenses of the Pre-Petition Bank Group Agent and the Pre-Petition Bank Group Lenders relating to the protection of the rights of the Pre-Petition Bank Group Agent and the Pre-Petition Bank Group Lenders under the Pre-Petition Bank Group Credit Agreement, including any and all documents executed in connection therewith or relating thereto, and applicable law prior to the commencement of the Cases. |
| | The proceeds of the DIP Loans (and the cash collateral of the Pre-Petition Bank Group Lenders) shall be used for the items and in the amounts set forth in a thirteen (13)-week budget (together with the additional budgets referred to herein, the "Budget"), prepared by the Debtors and reviewed and approved in writing by the Administrative Agent and DIP Lenders holding one hundred percent (100%) of the stated principal amount of the DIP Loans (the "Required Lenders") in their sole discretion. The Debtors may adjust the Budget as needed provided that they receive advance written approval from the Administrative Agent and the Required Lenders in their sole discretion. |
| | No portion of the DIP Loans, the Carve-Out or any cash collateral of the Pre-Petition Bank Group Lenders or the DIP Lenders shall be used to assert any |

| | |
|---|---|
| | claim or cause of action or make any objection against the Pre-Petition Bank Group Agent or the Pre-Petition Bank Group Lenders, or their advisors, agents and subagents, and/or challenging any claim or lien of the Pre-Petition Bank Group Agent or the Pre-Petition Bank Group Lenders or the validity or enforceability of the Pre-Petition Bank Group Credit Agreement or any related loan document, and/or challenging any pre-petition payment or transfer to the Pre-Petition Bank Group Agent or the Pre-Petition Bank Group Lenders; provided that any DIP Loans used to pay any counsel of and financial advisor to the Committee, if any is formed, to investigate any of the foregoing shall not exceed $25,000.00 in the aggregate. |
| **Loan Documentation:** | Definitive loan documentation set forth in the DIP Documents including, without limitation, the DIP Term Sheet. |
| **Covenants:** | |
| **Affirmative Covenants:** | The Debtors shall agree to produce and distribute the variance reports and other Budget materials required herein to the parties entitled to receive the same (including the Committee, if one is appointed). The Debtors shall agree to diligently and in good faith pursue (i) the procedures (the "Sale Procedures") for the sale of all of the Debtors' assets and (ii) the sale of the Debtors' assets pursuant thereto, including, without limiting the generality of the foregoing, by negotiating in good faith with potential purchasers of the Debtors' assets pursuant to the Sale Procedures and using their best efforts to conclude such negotiations as soon as is practicable, by executing and delivering asset purchase agreements upon conclusion of such negotiations, and by promptly filing with the Court all necessary motions with respect thereto. |
| | Other affirmative covenants to include, without limitation: delivery of financial statements, reports, accountants' letters, projections, officers' certificates, weekly and monthly reporting packages and other information reasonably requested by the Administrative Agent and the DIP Lenders (including information required to be delivered pursuant to the Cases and reports with respect to compliance with the Budget as provided herein); maintenance of existence; maintenance of properties, notice of default, litigation and other material events; taxes; compliance with laws, governmental approvals, environmental compliance; books and records; inspections rights; use of proceeds; collateral and security interests; certain obligations respecting subsidiaries. |
| | The Debtors shall cooperate with and permit the Administrative Agent and the Required Lenders to have reasonable access to the Collateral and non-privileged records during normal business hours. The Debtors shall make available to the Administrative Agent and the Required Lenders at Administrative Agent's or the Required Lenders' reasonable request all documents related to the sale of the collateral granted under the Pre-Petition Credit Agreement (the "Pre-Petition Collateral") prior to their filing with the Court. The Debtors shall immediately grant the Administrative Agent and the Required Lenders access to the due diligence room established for bidders of the Debtors' assets (as defined below). |
| | **Other affirmative covenants to be determined.** |
| **Negative Covenants:** | Limitations on: indebtedness; liens; guarantee obligations; mergers, consolidations, liquidations and dissolutions; sales of assets (other than in the ordinary course); leases; dividends and other payments in respect of capital stock; capital expenditures; investments, loans and advances; optional payments and |

modifications of subordinated and other debt instruments; transactions with affiliates; sale and leasebacks; changes in fiscal year; negative pledges; changes in lines of business; changes in tax status; payment of Pre-Petition Date claims except to the extent authorized by the Court; the existence of any claims other than those of the Administrative Agent and the Lenders entitled to superpriority under Bankruptcy Code § 364(c)(1) (except to the extent permitted by the Interim and Final Orders).

**Other negative covenants to be determined.**

## REQUEST FOR APPROVAL OF PROPOSED DIP FINANCING

27.     As described above, it is essential to the success of these cases that the Debtors immediately obtain access to sufficient post-petition financing, without which the Debtors will be unable to operate or generate income. The Debtors' continuing viability, ability to maximize the value of their estates for the benefit of their creditors, and their ability to pursue the Proposed Sale at the Auction thus depends heavily upon the expeditious approval of the DIP Credit Agreement and the related actions requested herein.

28.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to Section 364(c) of the Bankruptcy Code,[4] a court may authorize a debtor-in-possession to obtain

---

[4]     Section 364(c) of the Bankruptcy Code provides as follows:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503 (b) or 507 (b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

credit or incur debt, repayment of which is entitled to superpriority administrative expense status

or is secured by a senior lien on unencumbered property or a junior lien on encumbered property,

or combination of the foregoing. Pursuant to section 364(d) of the Bankruptcy Code,[5] a court

may authorize a debtor-in-possession to obtain credit or incur debt secured by a senior or equal

lien on property of the estate that is already subject to a lien.

29.    As a condition to entering into the DIP Credit Agreement and obtaining

the Debtors' needed liquidity, the Debtors must obtain authorization, pursuant to sections 364(c)

and (d) of the Bankruptcy Code, (a) to grant the Administrative Agent, for the benefit of itself

and the DIP Lenders, automatically perfected security interests in and liens upon all of the DIP

Collateral and (b) grant the Post-Petition Obligations allowed superpriority administrative

expense claim status in each of the Cases and any successor Cases.

### *Approval Under Section 364(c) of the Bankruptcy Code*

30.    The statutory requirement for obtaining post-petition credit under section

364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtors-in-

possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of the

Bankruptcy Code as an administrative expense." *See* In re Garland Corp., 6 B.R. 456, 461

(B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) is authorized, after notice and

---

[5]     Section 364(d) of the Bankruptcy Code provides as follows:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

hearing, upon showing that unsecured credit cannot be obtained); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (noting that "although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under section 364(a) & (b)"); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code).

### *The Debtors Were Unable to Obtain Necessary Post-Petition Financing on an Unsecured Basis under 11 U.S.C. § 364(a) or (b)*

31.     As set forth in the White Declaration, and as the evidence at the Final Hearing will show, the Debtors could not have obtained a working capital facility of the type and magnitude required in these cases on an unsecured basis.

32.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by good faith effort that credit was not available without" the protections of section 364(c) of the Bankruptcy Code. *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id* at 1088; *see also Ames*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom*, *Anchor Savings Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

33.     Other than the proposed DIP financing, there are no viable financing alternatives available to the Debtors under the circumstances. The Debtors have been exploring financial alternatives for at least two years and are intimately familiar with the lack of financing available to them. In fact, the Debtors retained an investment banker to seek alternative financing and it was unable to obtain any on terms as favorable as those contained in the proposed DIP financing. For a number of reasons, including the current state of the financial markets, the size of the financing required, the nature and state of the Debtors' business operations, the immediacy of the Debtors' financing needs, and the liens of the Pre-Petition Bank Group Lenders on the Prepetition Collateral, the Debtors are convinced that other than the proposed DIP financing they would be entirely unable to obtain financing to address the their urgent liquidity needs.

34.     Moreover, as noted above, virtually all of the Debtors' assets are encumbered by liens and security interests granted to the Pre-Petition Bank Group Lenders and the Noteholders. Thus, even if alternative debtor-in-possession financing were available on favorable terms and conditions and could be consummated in a time frame required to address the Debtors' immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with the Pre-Petition Bank Group Lenders and the Noteholders, the results of which could not be predicted with certainty. Any uncertainty occasioned by protracted financing litigation would be extremely damaging to the Debtors, immediately jeopardizing their Chapter 11 cases at the outset.

### *Approval of Priming Liens*

35.     If a debtor-in-possession is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor-in-possession may obtain credit secured by a

senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Section 364(d) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by priming liens, provides that the court, after notice and hearing, may authorize the debtor-in-possession to obtain credit or incur debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

36.    As discussed above, the Debtors have explored financial alternatives and are aware of the lack of financing available to them. In light of that, and given the state of the credit markets, the Debtors have concluded that financing comparable to that provided by the Administrative Agent under the DIP Credit Agreement is currently unobtainable without the priming of the prepetition liens of the Pre-Petition Bank Group Lenders. *See In re Utah 7000, L.L.C.*, 2008 WL 2654919, *2 (Bankr. D. Utah July 3, 2008) (finding that the debtor unable to obtain financing without priming of prepetition liens); *In re Mosello*, 195 B.R. 277, 287 (Bankr. S.D.N.Y. 1996) (same); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (same); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (same).

37.    Thus, the Debtors are unable to obtain alternative post-petition financing through credit allowable as an unsecured basis and without granting priming liens. In these circumstances, the Debtors, in the exercise of their considered business judgment and in consultation with their professional advisors, have determined that the financing provided by the DIP Credit Agreement is the most favorable under the circumstances and provides the Debtors

necessary liquidity to maintain the going concern value of their business pending the conclusion of the Debtors' proposed sale process.

*__The Post-Petition Loan is Necessary to Preserve Assets of the Debtors' Estates__*

38. In cannot reasonably be disputed that the Debtors have an immediate need for access to a working capital facility. As with most large food and agricultural businesses, the Debtors have significant cash needs. Access to substantial credit to purchase inventory and to keep their production and other operations running is critical to the Debtors' survival. In the absence of immediate access to cash and credit, the Debtors' suppliers may refuse to supply the inventory and services required to maintain operations.

39. As stated above, the DIP Credit Agreement is also essential so that the Debtors can immediately instill their employees, suppliers and customers with confidence in the Debtors' ability meet their obligations to these important stakeholders. Absent such confidence, the Debtors will not have the resources or support necessary to maintain operations and preserve their values as a going concern.

40. The success of these cases thus depends on the confidence of the Debtors' employees, vendors, and customers. If the DIP Motion is denied or delayed, that confidence may be destroyed, and the success of these chapter 11 cases might be irreparably damaged. In contrast, once the DIP Credit Agreement is approved, the Debtors' ability to provide their employees, vendors, customers, and other important stakeholders with the necessary confidence will be assured. The Debtors' need for access to the DIP Loans is, therefore, immediate.

*__Application of the Business Judgment Standard__*

41. After appropriate and extensive investigations and analysis, and robust, good faith, and arm's length negotiations among the Debtors, the Administrative Agent, the DIP

Lenders, the Pre-Petition Bank Group Agent, and the Pre-Petition Bank Group Lenders, the Debtors' management concluded that the proposed DIP financing and the use of cash collateral is the best alternative available in the circumstances of these cases. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment on behalf of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"); *In re TM Carlton House Partners, LTD*, 91 B.R. 349, 357 (Bankr. E.D. Pa. 1988) (holding that due to the debtor's distinct awareness of its own financial needs, the court would not second-guess its business judgment to put aside cash to effectuate a refinancing of its debts); *cf. Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding the rejection or assumption of a lease is left to the business judgment of the debtor); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus. Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

42.     The terms of the proposed DIP financing are in the best interests of the Debtors' estates.  Accordingly, the Debtors should be granted authority to enter into the DIP Term Sheet and obtain funds from the DIP Lenders on the secured, administrative "superpriority" basis described above, pursuant to sections 364(c) and (d) of the Bankruptcy Code.

## *Highlighted Provisions Under Rule 4001-2*

43.     Local Rule 4001-2(a) states in pertinent part that:

(i) All Financing Motions must (a) recite whether the proposed form of order and/or underlying cash collateral stipulation or loan agreement contains any provision of the type indicated below, (b) identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement and (c) justify the inclusion of such provision:

(A) Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);

(B) Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters;

(C) Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c);

(D) Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;

(E) Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F) Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out; and

(G) Provisions that prime any secured lien without the consent of that lienor.

Del. Bankr. Local Rule 4001-2(a)(i).

44. Pursuant to Local Rule 4001-2(a)(i)(A), ¶ 2 of the Interim Order provides that the Debtors will repay in full the Revolver with proceeds of the Replacement DIP Loan. While this is not technically a cross-collateralization as contemplated by the Local Rule, it nonetheless warrants highlighting here.

45. Pursuant to Local Rule 4001-2(a)(i)(C), ¶ 46 of the Interim Order provides that subject to the entry of the Final Order, except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the chapter 11 Cases or any future proceedings or cases related hereto, at any time, shall be charged against the DIP Lenders or the Pre-Petition Bank Group Lenders, their claims, or the Collateral, pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lenders or the Pre-Petition Bank Group Lenders, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders or the Pre-Petition Bank Group Lenders.

46. Pursuant to Local Rule 4001-2(a)(i)(E), ¶ 2 of the Interim Order and the DIP Term Sheet provide that the Debtors will request the Bankruptcy Court's authority to use the DIP Loans to pay $40,000,000 in obligations under the Pre-Petition Revolver..

47.     Pursuant to Local Rule 4001-2(a)(i)(G), ¶ 11(a) of the Interim Order and provides that the Post-Petition Liens and the DIP Super-Priority Claim should be senior and prior in all respects to (a) the Post-Petition Replacement Liens (as defined in the DIP Term Sheet) and all other liens securing any Pre-Petition Collateral, in all cases, granted under the Pre-Petition Financing Documents or otherwise, and (b) the Adequate Protection Super-Priority Claims (as defined in the DIP Term Sheet), any other obligations in respect of adequate protection and all other claims held by the Pre-Petition Bank Group Agent, the Pre-Petition Bank Group Lenders (including, without limitation any super-priority claims in addition to the Adequate Protection Super-Priority Clams) and the Noteholders, in each case, whether arising under or related to the Pre-Petition Financing Documents, this Interim Order or otherwise.

48.     The justification for the provisions of the DIP Credit Agreement for which disclosure is required pursuant to Local Rule 4001-2 is the immediate and critical need for this financing.  As discussed above, the Debtors were unable to secure postpetition financing on terms more favorable than that obtained from the DIP Lender and the Administrative Agent and such financing is critical to the maximization of recoveries for the Debtors' creditors.  Indeed, without this financing, the Debtors will be forced to immediately shut down and liquidate, and any significant returns for unsecured creditors will almost certainly be eliminated.  Accordingly, the facts and circumstances of these cases justify the inclusion of the terms that require disclosure under Local Rule 4001-2, and these terms of the DIP Term Sheet should be approved.

## REQUEST FOR USE OF CASH COLLATERAL

49.     The Debtors will require the ability to use cash and the proceeds of existing accounts receivable and inventory to maintain the operation of their businesses and preserve their value as going concerns.  These essential items, however, constitute part of the

Prepetition Collateral (the "Cash Collateral") and, therefore, may not be used in support of the Debtors' ongoing business activities absent compliance with section 363(c)(2) of the Bankruptcy Code.

50.    Section 363(c)(2) of the Bankruptcy Code provides that:

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorized such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

51.    In the instant cases, the DIP Lenders have consented to the Debtors' use of Cash Collateral.   The Debtors are currently in discussions with counsel to the Noteholders regarding adequate protection for the use of their cash collateral.   To the extent there is no agreement, the Debtors intend to seek approval for use of the Noteholders' cash collateral notwithstanding their objection.  Because such use is essential to the preservation of the Debtors' estates, the Court should approve the Debtors' use of Cash Collateral under section 363(c)(2) of the Bankruptcy Code.

**APPROVAL OF ADEQUATE PROTECTION**

52.    In exchange for the Debtors' use of the Prepetition Collateral, including Cash Collateral, and the priming of the prepetition liens of the Pre-Petition Bank Group Lenders (the "Pre-Petition Liens"), the Pre-Petition Bank Group Lenders are entitled to receive adequate protection pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any diminution in the value of each of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from the Debtors' use, sale, or lease (or other decline in value) of such collateral, the imposition of the automatic stay, the priming of the Pre-Petition Liens on the

Prepetition Collateral, and the subordination to the Carve Out (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

### *Pre-Petition Bank Group Lenders' Adequate Protection*

53. The Debtors propose to provide the Pre-Petition Bank Group Agent, for the benefit of itself and the Pre-Petition Bank Group Lenders for the benefit of themselves, with adequate protection in accordance with sections 361, 363, and 364 of the Bankruptcy Code. To that end, the Debtors, the Pre-Petition Bank Group Agent, and the Pre-Petition Bank Group Lenders have negotiated, and the Debtors request the Court approve, as of the Petition Date, certain protections of the Pre-Petition Bank Group Agent's and the Pre-Petition Bank Group Lenders' interest in the Prepetition Collateral from any Diminution in Value of each of their respective interests in the Prepetition Collateral. Such adequate protection, as described more fully in the Interim Order, is summarized below.

(a) Post-Petition Replacement Liens. As adequate protection for any Diminution in Value and as an inducement to the Pre-Petition Bank Group Agent and the Pre-Petition Bank Group Lenders to permit the Debtors' use of the Cash Collateral as provided in the Interim Order, the Debtors shall grant, assign and pledge to Pre-Petition Bank Group Agent, for the benefit of the Pre-Petition Bank Group Lenders, post-petition replacement security interests in and liens (the "Post-Petition Replacement Liens"), subject to the Carve-Out, on all of the Collateral whether acquired before, or after the Petition Date. Upon entry of the Interim Order, the liens and security interests granted to Pre-Petition Bank Group Agent as adequate protection shall be valid, perfected and enforceable against the Collateral without further filing or recording of any document or instrument or the taking of any further actions.

(b)     <u>Adequate Protection, Super-Priority Claim</u>.  The Pre-Petition Bank Group Agent, on behalf and for the benefit of the Pre-Petition Bank Group Lenders, shall be granted, to the extent of any Diminution in Value, a super-priority claim (the "<u>Adequate Protection Super-Priority Claim</u>") that shall have priority (except with respect to (i) the liens and super-priority claims granted to Post-Petition Agent and the DIP Lenders in connection with the Post-Petition Financing Documents, (ii) the Post-Petition Replacement Liens granted pursuant to clause (a), above, and (iii) the Carve-Out) in each of the Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or name whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code.  The Adequate Protection Super-Priority Claim shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof, excluding the proceeds of the Debtors' claims and causes of action asserted or prosecuted under chapter 5 of the Bankruptcy Code, and shall be subject and subordinate only to (i) the liens and super-priority claims granted to Post-Petition Agent and the DIP Lenders in connection with the Post-Petition Financing Documents, (ii) the Post-Petition Replacement Liens, and (iii) the Carve-Out and not to any other claim, including, without limitation, pre- and post-Petition Date intercompany claims.

(c)     <u>Payment of Fees, Costs and Expenses</u>.  The Pre-Petition Bank Group Agent and the Pre-Petition Bank Group Lenders shall be entitled to have the Debtors pay all reasonable out-of-pocket costs and expenses incurred by the Pre Petition Bank Group Agent

and the Pre-Petition Bank Group Lenders with respect to the Pre-Petition Obligations (including, without limitation, the reasonable fees and disbursements of counsel and other professional advisers advising the Pre-Petition Bank Group Agent and the Pre-Petition Bank Group Lenders, including Greenberg Traurig LLP, and any other professionals retained by the Pre-Petition Bank Group Agent, including an industry consultant, and any other professionals retained by the Pre-Petition Bank Group Lenders, including an industry consultant) and in connection with the protection and enforcement of the rights and interests of the Pre-Petition Bank Group Lenders, whether such fees, costs, disbursements and expenses were incurred prior to, on or after the Petition Date (provided that any such fees, costs, disbursements and expenses incurred prior to the Petition Date shall be subject to entry of the Final Order), within five business days of presentation (with copies to counsel for any Committee and the United States Trustee) of an invoice therefor (which invoice may be redacted to remove privileged or case sensitive material) without the requirement of prior Court approval or compliance with guidelines applicable to retained professionals.

(d) <u>Reservation of Rights</u>. The Pre-Petition Bank Group Agent and the Pre-Petition Bank Group Lenders reserve the right to request additional or further adequate protection of their interests in the Pre-Petition Collateral.

(e) <u>Recognition of Pre-Petition Liens and Pre-Petition Bank Group Claim</u>. Subject to certain provisions of the Interim Order, upon entry of the Interim Order, (i) the Pre-Petition Liens shall be deemed valid, perfected, binding, and enforceable, shall not be avoidable under the Bankruptcy Code, and shall not be subject to subordination under section 510 of the Bankruptcy Code, and (ii) the Pre-Petition Bank Group Claim (as defined in the Interim Order) shall be allowed and not subject to any offset, defense, counterclaim, right of

recoupment, recharacterization, disallowance under section 502(d) of the Bankruptcy Code or subordination under section 510 of the Bankruptcy Code.

(f)   Adequate Protection Payments.  As further adequate protection, the Debtors seek to pay the Pre-Petition Bank Group Lenders an amount equal to the accrued, unpaid interest on the Pre-Petition Bank Group Lender Debt (as defined in the DIP Term Sheet, consisting of the Term A Loan and Term B Loan) not previously repaid, such payments to be monthly in arrears.

### *Conclusion*

54.   The Debtors believe that the proposed adequate protection is fair and reasonable.  The Pre-Petition Bank Group Agent and the Pre-Petition Bank Group Lenders have agreed that the adequate protection summarized above and provided for in the Interim Order is sufficient to allow the Debtors to use their Cash Collateral.  Furthermore, the priming of the Pre-Petition Liens will enable the Debtors to obtain the DIP Credit Agreement.  As a result, the Pre-Petition Bank Group Agent and the Pre-Petition Bank Group Lenders consent to such priming liens and are entitled to receive adequate protection of their interest in their respective interests in the Prepetition Collateral.

55.   Accordingly, based on the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide certain adequate protections in accordance with the terms set forth in the Interim Order.

### THE DEBTORS SHOULD BE PERMITTED TO MAKE INTERIM BORROWINGS UNDER THE DIP TERM SHEETS

56.   This Court is empowered to conduct a preliminary expedited hearing on the DIP Motion and authorize the Interim Order.  Specifically, Bankruptcy Rule 4001(c) governs

the procedures for securing authorization to obtain debtor-in-possession financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c).

57.     Pending a final hearing, the Debtors require $52,000,000 under the DIP Credit Agreement for, inter alia, payment of vital services and other working capital needs as well as to comply with the DIP Term Sheet's requirement to repay the Revolver of $40,000,000. It is essential that the Debtors immediately stabilize their operations and resume paying for ordinary, post-petition operating expenses in order to preserve the value of the Debtors' estates for the benefit of all the Debtors' creditors and equity holders.

58.     Absent immediate financing for their continuing business operations, the Debtors will be unable to pay operating expenses and, therefore, unable to continue to conduct their businesses pending the Final Hearing.  Consequently, if interim relief is not obtained, the Debtors, their estates, their creditors and equity holders, their businesses, their employees, and their assets will suffer immediate and irreparable harm.

59.     Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 15-day period following the filing of a motion requesting authorization to obtain post-petition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Bankruptcy Rule 4001(c)(2).  The Debtors' current financial distress and acute need for post-petition liquidity, provides ample evidence to support

the conclusion that the Debtors will avoid immediate and irreparable harm only if the Court authorizes the relief provided for in the Interim Order.

60. Accordingly, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing on the Petition Date or as soon thereafter as is practical to consider the Debtors' request for authorization to obtain interim financing under the DIP Term Sheet up to a maximum in the aggregate principal amount of $52,000,000 to sustain operations and comply with terms and conditions of the DIP Term Sheet.

## GOOD FAITH

61. The Debtors submit that the terms and conditions of the DIP Term Sheet, and the fees paid and to be paid thereunder, are the best available to the Debtors under the circumstances. As stated above, the Debtors, the Administrative Agent, the DIP Lenders, the Pre-Petition Bank Group Agent, and the Pre-Petition Bank Group Lenders negotiated the terms and conditions of the DIP Term Sheet and the use of Cash Collateral in good faith and at arm's length. Moreover, the Debtors decision to enter into the DIP Term Sheet was an exercise of the Debtors' prudent business judgment. Therefore, the Administrative Agent, DIP Lenders, the Pre-Petition Bank Group Agent, and the Pre-Petition Bank Group Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the DIP Term Sheets, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

## REQUEST FOR MODIFICATION OF THE AUTOMATIC STAY

62. The Interim Order contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code, to the extent necessary, to effectuate all of the terms and provisions of the Interim Order, including, without limitation, to (a) permit the Debtors to grant the adequate protection set forth herein; (b) permit the Debtors to perform

such acts as the Administrative Agent, the DIP Lenders, Pre-Petition Bank Group Agent or the Pre-Petition Bank Group Lenders may request in its sole discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the Administrative Agent, the DIP Lenders, the Pre-Petition Bank Group Agent, and the Pre-Petition Bank Group Lenders under the DIP Documents, the DIP Credit Agreement, and the Interim Order; and (d) authorize the Debtors to pay and the Administrative Agent, the DIP Lenders, the Pre-Petition Bank Group Agent, and the Pre-Petition Bank Group Lenders to retain and apply payments made in accordance with the terms of the Interim Order.

63.     Stay modification provisions of this type are customary features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the Interim Order.

### REQUEST TO WAIVE BANKRUPTCY RULES 6003(B), 6004(A), AND 6004(H)

64.     In order to successfully implement the foregoing, the Debtors respectfully request that the Court waive the notice requirements provided for by Bankruptcy Rule 6004(a), the twenty-day stay provided for by Bankruptcy Rule 6003(b), and the ten-day stay provided for by Bankruptcy Rule 6004(h). The Debtors believe, for the reasons set forth above, that ample justification exists for the Court to waive Bankruptcy Rule 6003(b), 6004(a), and 6004(h).

### REQUEST FOR FINAL HEARING

65.     Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request the Court to set a date for the Final Hearing that is no later than 25 days from the Petition Date.

## NOTICE

66.     Notice of the DIP Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including: (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) the parties included on the Debtors' list of thirty (30) largest unsecured creditors; (iv) counsel to the Pre-Petition Bank Group Agent and the Pre-Petition Bank Group Lenders; (v) counsel to the Noteholders; and (vi) to the extent practicable, to any other entity or individual that has asserted a security interest in or lien on any of the DIP Collateral. The parties have made reasonable efforts to afford the best notice possible under the circumstances.

## NO PRIOR REQUEST

67.     No prior request for the relief sought in the DIP Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form of the Interim Order annexed hereto as **Exhibit A**; (ii) schedule the Final Hearing, (iii) after the Final Hearing, enter a Final Order substantially in the form of the Interim Order and as filed with the Court prior to the Final Hearing; and (iv) grant such other and further relief as is just and proper.

December 19, 2010
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Derek C. Abbott (No. 3376)
Ann C. Cordo (No. 4817)
Chad A. Fights (No. 5006)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*

3955208.6

33