IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| TOWNSENDS, INC., *et al.*,[1] | ) | Case No. 10-14092 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | Hearing Date: January 28, 2011 at 11:00 a.m. (ET)<br>(Requested for Bidding Procedures portion of Motion only)<br>Objection Deadline: January 26, 2011 at 4:00 p.m. (ET)<br>(Requested for Bidding Procedures portion of Motion only) |

**DEBTORS' MOTION FOR ORDERS (I) (A) APPROVING (i) BIDDING PROCEDURES; (ii) BID PROTECTIONS; (iii) AUCTION PROCEDURES; AND (iv) ASSUMPTION AND ASSIGNMENT PROCEDURES; (B) APPROVING NOTICE PROCEDURES FOR (i) THE SOLICITATION OF BIDS, (ii) AN AUCTION; (C) SCHEDULING HEARINGS ON APPROVAL OF A SALE OR SALES OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS; AND (D) GRANTING RELATED RELIEF; AND (II) APPROVING THE SALE OR SALES OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES**

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby move (the "Motion") pursuant to sections 105(a) and 363(b), (f), and (m), 365, and 1146(c) of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for the entry of: (a) an order substantially in the form annexed as **Exhibit A** hereto that (i) approves bidding procedures; (ii) approves the form and manner of notice of the sale or sales of the Debtors' assets; (iii) approves the form and manner of notice of the assumption and assignment, including cure amounts, of executory contracts and unexpired leases; (iv) establishes the date for an auction; (v) establishes dates for a sale hearing; and (vi) grants related relief; and (b) an order

[1] The Debtors, followed by the last four digits of their respective taxpayer identification numbers, are as follows: Townsends, Inc. (0681); Townsend Farms, Inc. (5263); Townsends of Arkansas, Inc. (5644); Townsend Farms of Arkansas, Inc. (0027); and Crestwood Farms LLC (7388) c/o 22855 DuPont Boulevard, Georgetown, DE 19947.

substantially in the form annexed as **Exhibit E** hereto: (i) approving the sale or sales of some or all of the Debtors' assets free and clear of all liens, claims, interests, and encumbrances to a successful bidder(s) at the auction (the "Successful Bidder") or a stalking horse to be selected by the Debtors (the "Stalking Horse Purchaser," and with the Successful Bidder, the "Purchaser"); (ii) authorizing the Debtors to assume and assign assigned contracts and leases; and (iii) granting related relief. In support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory bases for the relief requested herein are sections 105(a) and 363(b), (f), and (m), and 365 of the Bankruptcy Code and rules 2002, 6004, 6006 and 9014 of the Bankruptcy Rules.

## BACKGROUND

3. On December 19, 2010 (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases. The Debtors are operating their respective businesses as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4. The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the Declaration of George C. White in Support of First Day Motions [D.I. 3] (the "White Declaration") filed contemporaneously herewith and incorporated herein by reference.

5. On December 29, 2010, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I. 96].

**The Debtors' Business**

6. The Debtors are leading producers and marketers of quality, value added poultry products to the foodservice and retail grocery markets throughout the world.

7. Through vertical integration, the Debtors manage breedstock egg production, hatching and the growing of chickens including both breed stock and broiler chickens. The Debtors also manage the feed manufacturing, growing, processing, packaging and distribution functions to support their operations.

8. The Debtors own three processing plants in North Carolina and one processing plant in Arkansas. The breeding and hatching operations in Arkansas and North Carolina have a capacity of 1.3 million eggs per week. The Debtors produce approximately 700 million pounds of poultry annually. The Debtors also have approximately 950,000 tons of annual finished feed capacity in their feed milling operations to support their live chicken operations. In addition, the Debtors have an innovation center located in Atlanta, Georgia, which specializes in creating distinctive products and adapt quickly to consumer trends while working hand-in-hand with key foodservice customers to achieve their specific poultry product objectives.

9. As of December 8, 2010, the Debtors had approximately 3017 employees. As of December 5, 2010, the Debtors' unaudited consolidated financial statements reflected $504.2 million of revenue for the prior 12-month period, assets of approximately $131 million and liabilities of approximately $127 million.

**<u>The Debtor-in-Possession Financing Facility Maturity Date and Requirements</u>**

10. On December 19, 2010, the Debtors filed the *Motion of the Debtors for Orders (A) Authorizing Debtors (I) To Obtain Post-Petition Financing And Granting Security Interests and Superpriority Administrative Expense Status Pursuant To 11 U.S.C. § 364; (II) To Use Cash Collateral Pursuant To 11 U.S.C. §363; (III) To Provide Adequate Protection Pursuant To 11 U.S.C. §361; And (B) Scheduling a Final Hearing And Establishing Related Notice Requirements* [D.I. 16], which among other things, requested interim and final approval of the Debtors' proposed debtor-in-possession financing (the "<u>DIP Facility</u>") to be provided by Wilmington Trust Company, as administrative agent (the "<u>Administrative Agent</u>") and the lenders party thereto (the "<u>DIP Lenders</u>").

11. On December 22, 2010, after the entry of two interims orders authorizing the use of cash collateral, the Court entered the *Interim Order (A) Authorizing The Debtors To Obtain First-Priority Secured Post-Petition Financing, (B) Authorizing The Debtors To Use Cash Collateral Of Existing Secured Lenders, And Providing Related Adequate Protection, And (C) Prescribing Form And Manner of Notice And Setting The Time For The Final Hearing* [D.I. 69], which, among other things, approved the DIP Facility on an interim basis.

12. A final hearing on the DIP Facility has been continued to January 25, 2010.

13. The current contemplated maturity date of the DIP Facility is no later than February 20, 2011 (the "<u>DIP Facility Maturity Date</u>"), upon which date all advances and obligations under the DIP Facility shall be immediately due and payable in full in cash. As of the date hereof, the Debtors have received no extensions to the DIP Facility Maturity Date from the DIP Lenders. Further, the contemplated DIP Facility requires the Debtors to accomplish

certain milestones in the sale process by various dates certain of which have been extended from time to time.

## THE SALE PROCESS

14. By this Motion, the Debtors seek authority to market and sell substantially all of their assets. The Debtors propose these sale procedures to facilitate the sale of substantially all of the Debtors' assets to the Purchaser, should one be selected. A successful going-concern sale of substantially all of their assets (the "Sale") is the best way to maximize the value of the Debtors' estates.

### A. The Marketing Process

15. Since the Petition Date, the Debtors, with the assistance of their key management personnel and professionals, have focused their efforts principally on stabilizing its operations, obtaining Bankruptcy Court approval of and negotiating acceptable terms to a debtor-in-possession financing facility and continuing post-petition a marketing process for the sale of their Assets (as defined below) and business (the "Business") began in 2008.

16. As part of this marketing effort, the Debtors, through SSG Capital Advisors, LLC ("SSG"), have conducted and continue to conduct an extensive marketing process targeting buyers based on a variety of factors, including a potential buyer's perceived interest in the Debtors' Business and Assets, its familiarity with the Debtors' Business and its financial ability to consummate a transaction with the Debtors.

17. Currently, a number of interested parties are completing due diligence and negotiating forms of asset purchase agreements with the Debtors with regard to the Assets and Business. As of the date hereof, however, no asset purchase agreement has been executed with any such party. In the event the Debtors are able to reach agreement on an appropriate "stalking

horse" bid, it will seek to establish such bidder as a "stalking horse" in accordance with the procedures set forth herein.

18. The Debtors, with the assistance of SSG, its attorneys and other representatives, have assembled data and documents to facilitate the diligence process and have prepared business presentations to provide for an organized and efficient transmission of a large amount of data related to the Assets and Business.

19. Accordingly, the Debtors have concluded that: (a) despite the absence of an executed "stalking horse" agreement, a prompt and open sale of the Assets and Business in which all interested buyers are encouraged to participate is the best way to maximize value for their estates within the remaining term of the DIP Facility, and (b) the proposed Bidding Procedures described herein are the most effective method of obtaining the highest and best offer for the Assets and Business.

**B. The Form Purchase Agreement**[2]

20. After negotiations with several potential purchasers, the Debtors determined that distributing the form purchase agreement (the "Form Purchase Agreement"), attached hereto as **Exhibit B**, to interested parties (i) represented the best opportunity for the Debtors to maximize the value of their assets and (ii) serve as the best available platform for conducting an auction to seek higher and/or better offers. Should the Debtors, in their sole discretion, but in consultation with the Committee and the DIP Lenders, elect to establish a Stalking Horse Purchaser, the Debtors and the Stalking Horse Purchaser shall enter into a purchase agreement that will be filed and distributed to all known potential bidders per the

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Form Purchase Agreement. To the extent that there are inconsistencies between any summary description of the Form Purchase Agreement contained herein and the terms and conditions of the Form Purchase Agreement, the terms and conditions of the Form Purchase Agreement shall control.

proposed Bidding Procedures. The Form Purchase Agreement contemplates the sale of substantially all of the Debtors' assets (the "Assets"), subject to higher and/or better bids.

## C. The Bidding Procedures[3]

21. The Debtors propose to test the marketplace by the sale and bidding process described below (the "Proposed Sale Process") to ensure that the Debtors' estates realize the maximum value for the Assets. The Assets may be sold in a single sale to a single purchaser or in parts to several purchasers. In connection therewith, the Debtors requests that this Court approve the Proposed Sale Process, including the following Bidding Procedures (the "Bidding Procedures"):[4]

*Provisions Governing Qualifications of Bidders and Bids*

- Initial Bids. Any third party (other than a Stalking Horse Purchaser) that is interested in acquiring the Assets must be a Qualified Bidder who submits an "Initial Bid" in conformance with the following procedures at or prior to the date set forth in the Bidding Procedures Order, currently proposed as **February 14, 2011 at 12:00 p.m. (ET)** (the "Bid Deadline"). For the purposes of these Bidding Procedures, a Stalking Horse Agreement (as defined below) shall be deemed to be a Qualified Bid. For any Initial Bid to constitute a Qualified Bid, such Initial Bid must:

  a) contain a signed definitive asset purchase agreement (together with a copy of the signed agreement that is marked to show changes from the Form Purchase Agreement or the Stalking Horse Agreement, as applicable) (a "Qualified APA") and identifying the Assets the party seeks to purchase with, at a minimum, the following requirements: (i) having substantially identical terms and conditions as the Form Purchase Agreement or the Stalking Horse Agreement, as applicable, except with higher and better consideration, which can be determined by aggregating bids made on different portions of the Debtors' Assets ("Aggregate Bids"); (ii) containing terms and conditions no less

3 Capitalized terms used in this Section but not defined herein have the meanings ascribed to them in the Bidding Procedures. To the extent there are inconsistencies between any summary description of the Bidding Procedures contained herein and the Bidding Procedures attached as Exhibit 1 to the proposed Bidding Procedures Order, the terms of the Bidding Procedures shall control.

4 The following summary is provided for convenience. In the event of any inconsistency between the following summary and the Bidding Procedures, the latter shall control

favorable to Debtors' estates than the terms and conditions in the Form Purchase Agreement or the Stalking Horse Agreement, as applicable (provided that no Initial Bid shall provide for the payment to the bidder of any breakup fee, topping fee, expense reimbursement or other similar arrangement), including the evaluation of Aggregate Bids; (iii) providing for a purchase price equal to or greater than the Stalking Horse Agreement purchase price in the event the Debtors circulate a Stalking Horse Agreement, plus the Purchase Price Protection (including the value of the Assumed Liabilities); and (iv) not being subject to any (a) financing contingency, (b) contingency relating to the completion of unperformed due diligence, (c) contingency relating to the approval of the bidder's board of directors or other internal approvals or consents, or (d) any conditions precedent to the bidder's obligation to purchase the Assets other than those included in the Form Purchase Agreement or the Stalking Horse Agreement, as applicable;

b) Be accompanied by the provision of a certified or bank check, wire transfer, or letter of credit reasonably acceptable to the Debtors in the amount of at least 10% of the amount of the Initial Bid as a good faith deposit, to be held in escrow and credited to the closing payment if the Bidder is ultimately determined to be the Successful Bidder (as defined below) or to be returned to the bidder otherwise (the "Good Faith Deposit") and a written statement that the bidder agrees to be bound by the terms of these Bidding Procedures and the Bidding Procedures Order;

c) To extent not previously provided to Debtors, the Initial Bid must be accompanied by evidence satisfactory to Debtors in their commercially reasonable discretion the that the bidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Qualified APA (or its equivalent) in the event that it submits the Successful Bid (as defined below) at the Auction (as defined below);

d) Remain open and irrevocable until the earlier of the end of the second business day following the closing of the transaction and fifteen (15) days after the entry of an order by the Court approving a definitive agreement providing for the Sale of the Assets; and

e) Be submitted to (i) counsel for the Debtors: Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, DE 19899; Attn: Derek C. Abbott, Esq; Fax: 302-425-4664; Email: dabbott@mnat.com; (ii) investment banker for the Debtors: SSG Capital Advisors, LLC, Five Tower Bridge, Suite 420, 300 Barr Harbor Drive, West Conshohocken, PA, 19428; Attn: J. Scott Victor, Esq.; Fax:610-940-3875; Email: jsvictor@ssgca.com; (ii) counsel for the Debtors' secured

lender: Greenberg Traurig, LLP, 2700 Two Commerce Square, 2001 Market Street, Philadelphia, PA 19103; Attn: Attn: Diane Vuocolo, Esq.; Fax: 215-717-5230; Email: vuocolod@gtlaw.com; and (iii) counsel to the Creditors' Committee: Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068; Attn: Bruce D. Buechler, Esq.; Fax: 973-597-2309; Email: bbuechler@lowenstein.com and Womble Carlyle Sandridge & Rice, PLLC, 222 Delaware Avenue, Ste. 1501, Wilmington, DE 19801; Attn: Steven K. Kortanek; Fax: 302-661-7728; Email: skortanek@wcsr.com so as to be received not later than the Bid Deadline. The Debtors may extend the Bid Deadline without further notice and for one or more bidders, but shall not be obligated to do so.

- Evaluation of Competing Bids. The Bidding Procedures set forth various factors that would be considered by the Sellers in evaluating each Qualified Bid.

- No Qualified Bids. If the Sellers do not receive any Qualified Bids, the Auction shall be cancelled and the Debtors shall report the same to the Bankruptcy Court. In such circumstances, if the Debtors have executed a Stalking Horse Agreement, the Debtors shall promptly proceed to seek entry of the appropriate orders approving the Transaction with a Stalking Horse Purchaser pursuant to the terms and conditions set forth in the Stalking Horse Agreement.

- Selection of a Stalking Horse Bidder. The Debtors, in their sole discretion, but in consultation with the Committee and the DIP Lenders, may elect to establish a Stalking Horse Bidder at any time up to and including the Bid Deadline by executing an asset purchase agreement with such a bidder (the "Stalking Horse Agreement") during the sale process. If the Debtors do select a Stalking Horse Bidder, they will file and distribute to all known potential bidders a copy of the Stalking Horse Agreement on or before the commencement of the Auction. If it does not establish such a Stalking Horse Bidder, the Debtors will evaluate any Initial Bids, in consultation with the Committee and the DIP Lenders, to determine whether such Initial Bids constitute Qualified Bids and will select the Qualified Bid that it determines constitutes the highest and best offer for the purchase of the Assets on or before the commencement of the Auction, provided, however, that the Debtors, in the exercise of their business judgment, reserves the right to select such Qualified Bid at an earlier date or to reject any Initial Bid as insufficient.

*The Notice Procedures*

- Notice of Auction and Sale Hearing. After entry of the Bidding Procedures Order (as defined below), the Debtors will cause the Notice of

Auction and Sale Hearing, substantially in the form attached hereto as **Exhibit C**, to be served by first-class mail, postage prepaid, facsimile, electronic transmission, hand delivery or overnight mail upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to the Assets during the past nine (9) months, (ii) all taxing authorities or recording offices which have a reasonably known interest in the relief requested, (iii) the Office of the United States Trustee, (iv) counsel to the Creditors' Committee, (v) the office of the United States Attorney, (vi) all insurers, (vii) all non-debtor parties to relevant contracts or leases (executory or other), (viii) all known creditors of the Debtors, including all known persons asserting a lien, claim, encumbrance or other interest in, to or against any of the Debtors' assets, and (ix) all parties who have requested service pursuant to Bankruptcy Rule 2002**.**

- Assumption and Assignment Notice. Prior to the Sale Hearing, the Debtors will serve the Assumption and Assignment Notice by first class mail, postage prepaid, facsimile, electronic transmission, hand delivery or overnight mail on each Counterparty under each Assumed and Assigned Contract (and its attorney, if known) at the last known address available to the Debtors. The Assumption and Assignment Notice shall set forth the following information: (i) the name and address of the Counterparty, (ii) notice of the proposed effective date of the assignment (subject to the Debtors' and Purchaser's right to withdraw such request for assumption and assignment subject to the terms of the Form Purchase Agreement as modified by the Purchaser or the Stalking Horse Agreement, as applicable), (iii) identification of the Assumed and Assigned Contract, (iv) the amount, if any, determined by the Debtors to be necessary to be paid to cure any existing default in accordance with sections 365(b) and 365(f)(2) of the Bankruptcy Code (the "Cure Amount"), and (v) a description of the Purchaser and a statement as to the Purchaser's ability to perform the Debtors' obligations under the Assumed and Assigned Contract.

*The Auction*

- Auction. In the event that the Debtors timely receive a conforming Initial Bid from a Qualified Bidder, then Debtor will conduct an auction (the "Auction") currently proposed to start on **February 15, 2011 at 9:00 a.m. (ET)** with respect to the Sale of the Assets at the time and place set forth in the Bidding Procedures Order. In order to participate in the Auction, each prospective purchaser must be a Qualified Bidder and shall be required to comply with the requirements of the Bidding Procedures and to submit an Initial Bid that is timely and that complies in all respects with the Bidding Procedures. At the Auction, Qualified Bidders may submit successive bids in increments of at least $500,000 greater than the prior bid (the "Incremental Bid Amount") for the purchase of the Assets until there is only one (or more, in the case of Aggregate Bids) offer that Debtors determine, subject to Bankruptcy Court approval, is the highest

and/or best offer (the "Successful Bid"). When bidding at the Auction, a Stalking Horse Purchaser, if any, shall receive a "credit" in the amount of any Breakup Fee and maximum Expense Reimbursement. If no conforming Initial Bid from a Qualified Bidder shall have been received at or prior to the Bid Deadline, the Auction will not be held and the Sale Hearing will proceed with respect to the Stalking Horse Agreement, if applicable. All bids made at the Auction shall remain open until the earlier of the end of the second business day following the closing of the transaction and fifteen (15) days after the entry of an order by the Court approving a definitive agreement providing for the Sale of the Assets;

- Highest and/or Best Bid. At all times during the Proposed Sale Process, the Debtors shall retain full discretion and right to determine, in their sole discretion after consultation with appropriate creditor constituencies, which bid constitutes the highest or otherwise best offer for the purchase of the Assets, and which bid should be selected as the Successful Bid, if any, all subject to final approval by the Court pursuant to the provisions of section 363(b) of the Bankruptcy Code. Without limiting the generality of the foregoing, the Debtors may, at any time before entry of an order of the Court approving a Successful Bid, reject any bid that, in the Debtors' sole discretion, the Debtors determine (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Proposed Sale Process, or (iii) contrary to the best interests of the Debtors, their estates or their creditors. The Debtors may adopt rules for the Auction that, in their judgment, will better promote the goals of the Auction and that are not inconsistent with any of the other material provisions hereof or of any Court order.

*The Bid Protections*

- Breakup Fee. If a Stalking Horse Purchaser is chosen, upon the consummation of a Sale of the Assets to any party other than the Stalking Horse Purchaser who submits the Successful Bid at the Auction, the Debtors shall pay to the Stalking Horse Purchaser from the proceeds of such sale in cash or other immediately available funds an amount equal to **no more than 3% of the cash consideration set forth in the Stalking Horse Agreement**, as a Breakup Fee (which will be inclusive of any and all attorneys' fees and expenses, incurred by Stalking Horse Purchaser as Expense Reimbursement).

*The Sale Hearing*

- Sale Hearing. The Debtors intend to present the Successful Bid for approval by the Court pursuant to the provisions of sections 105, 363(b), 363(f), 363(m), 363(n), and 365 of the Bankruptcy Code at the final hearing to approve the Sale Motion (the "Sale Hearing") to be scheduled by the Court and currently proposed to be held on **February 18, 2011 at**

**10:00 a.m. (ET).** The Debtors shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing. Upon the failure to consummate a Sale of the Assets after the Sale Hearing because of the occurrence of a breach or default by the proposed purchaser under the terms of the Successful Bid, the next highest or otherwise best bid, if any, as disclosed at the Sale Hearing, shall be deemed the Successful Bid without further order of the Court and the parties shall be authorized to consummate the transaction contemplated by the backup Successful Bid (to the extent the party that submitted such backup Successful Bid is willing to serve as a backup bidder).

- Sale Implementation. Following the approval of the Successful Bid at the Sale Hearing, the Debtors will be authorized to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Successful Bid, including (but not limited to) seeking entry of one or more sale orders.

## RELIEF REQUESTED

### A. Summary of Relief Requested

22. By this Motion, the Debtors are requesting the entry of two orders concerning sales of the Assets. First, the Debtors seek the immediate entry of an order approving the Bidding Procedures as set forth above (the "Bidding Procedures Order") to provide for the orderly sale of the Assets. Second, the Debtors seek the eventual entry of an order approving any and all sales that are a result of the Bidding Procedures set forth above (the "Sale Order"). This relief requested by the Debtors is intended to provide for a competitive bidding and auction procedure for the Debtors' assets to maximize value for the Debtors' estates, creditors and other stakeholders as expeditiously as possible.

23. Following the entry of the Bidding Procedures Order, the Debtors will solicit bids, according to the Bidding Procedures, in hopes of receiving offers higher and better than the Form Purchase Agreement or the Stalking Horse Agreement, as applicable. In the event one or more Qualified Bids are received prior to the Bid Deadline, the Debtors will hold an Auction at which they, in consultation with the appropriate creditor constituencies, will choose

the parties (the "Successful Bidder") with highest and best bid(s) (defined previously as the "Successful Bid") for the Assets. There may be more than one Successful Bidder for the Assets but only one Successful Bidder for any particular Asset.

24. Following the Bid Deadline and after the Auction, if any, the Debtors will request the entry of an order (a) approving the Sale or Sales of the Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, rights of set off, and interests thereon and there against (collectively, the "Liens") (with such Liens attaching to the proceeds of the sale or sales), to the Successful Bidder(s) and (b) authorizing the Debtors to assume and assign the Contracts and Leases other than those Contracts and Leases that may be excluded under any purchase agreement with any Successful Bidder (such Contracts and Leases to be assumed and assigned pursuant to a purchase agreement, the "Assumed and Assigned Contracts").

**B. The Bidding Procedures Order**

25. The Debtors desire to receive the greatest value possible for their Assets. The Bidding Procedures were developed so as to be consistent with the Debtors' need to expedite the sale process but with the object of promoting active bidding that will result in the highest and best offer (or offers) possible. In addition, these procedures reflect the Debtors' objective of conducting an Auction in a controlled, but fair and open, manner that promotes interest in the Debtors' assets by financially-capable, motivated bidders who are likely to close a transaction, while simultaneously discouraging offers from persons the Debtors do not believe are sufficiently capable or likely to actually consummate a transaction.

26. In the event Qualified Bids are received, the Auction of the Debtors' assets will be held on **February 15, 2011 at 9:00 a.m. (ET)** at the offices of Morris Nichols

Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, Delaware 19801, or such other location determined by the Debtors, at which Auction the Debtors may select the highest and best Qualified Bid for any particular asset of the Debtors as a Successful Bid in accordance with the Bidding Procedures. **ALL SALE(S) SHALL BE SUBJECT TO THE APPROVAL OF THE BANKRUPTCY COURT.**

27. The Stalking Horse Purchaser (if one is chosen), parties who submit Qualified Bids prior to the Bid Deadline, representatives of the Creditors' Committee, representatives of the Debtors' secured lenders, the Debtors and the professionals of the foregoing shall be entitled to attend and be heard at the Auction. Any creditors of the Debtors who wish to attend the Auction may do so but must give notice of their attendance to counsel to the Debtors in writing on or prior to the Bid Deadline. The Auction will be conducted in accordance with the Bidding Procedures.

28. In the event that the Debtors have conducted an Auction or otherwise selected a Successful Bid in connection with the Bidding Procedures described above, the Sale Hearing shall be conducted by the Bankruptcy Court on **February 18, 2011 at 10:00 a.m. (ET)** or at such other time as the Bankruptcy Court permits.

29. Subject to Bankruptcy Court approval following the Auction, the Successful Bidder(s) shall purchase the Assets, free and clear of all Liens, pursuant to the Motion and the corresponding order of the Court approving the Motion (having purchased some or all of the Assets, the "Purchaser(s)").

30. Any sale of the Assets shall be without representation or warranties of any kind, nature or description by the Debtors, their agents or their estate, except as provided in the purchase agreement between the Debtors and the Purchaser. All of the Assets shall be

transferred "as is," "where is" and "with all faults." **THE DEBTORS EXPRESSLY DISCLAIM ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND MAKE NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE NATURE, QUALITY, VALUE OR CONDITION OF ANY ASSET.**

31. Following the Sale Hearing approving the sale of the Assets to the Successful Bidder(s), if any such Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Next Highest Bid, as disclosed at the Sale Hearing, will be deemed to be the Successful Bid and the Debtors will be authorized, but not required, to consummate the sale with the Qualified Bidder submitting the Next Highest Bid without further order of the Bankruptcy Court. In such case, the Successful Bidder's Good Faith Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder.

32. The Debtors submit that implementation of these Bidding Procedures will not chill the bidding, if any, for the Assets, especially given the Debtors' precarious financial situation and need to sell the Assets on an expedited basis.

**C. <u>Bid Protections</u>**

33. Should a Stalking Horse Purchaser be chosen, in recognition of the anticipated expenditure of time, energy, and resources and the benefit to the Debtors' estate of being the Stalking Horse Purchaser, the Debtors are requesting the authority to provide to the Stalking Horse Purchaser the Bid Protections as set forth above.

34. The Bid Protections shall undoubtedly be a material inducement for, and a condition of, the Stalking Horse Purchaser's entry into the Stalking Horse Agreement. The Debtors believe that the Bid Protections are fair and reasonable in view of, among other things,

(a) the intensive analysis, due diligence investigation and negotiations the Stalking Horse Purchaser has and will have undertaken in connection with the Sale and (b) the fact that the efforts of the Stalking Horse Purchaser will have increased the chances that the Debtors will receive the highest and best offer for their Assets by establishing a minimum bid for other bidders, attracting other bidders to the Auction and serving as a catalyst for other potential or actual bidders, all for the benefit of the Debtors, their estates, their creditors and all other parties in interest. The Debtors thus request that the Court approve and authorize payment of the Bid Protections by entry of the Bidding Procedures Order.

**D. Assumption and Assignment of Leases and Contracts**

35. In addition, to facilitate the sale, assumption, and assignment of the Leases and Contracts, the Debtors propose to serve the Assumption and Assignment Notice, in substantially the form attached hereto as **Exhibit D**, as soon as practicable after the entry of the Bidding Procedures Order and request that the Court approve the following procedure for fixing any cure amounts owed on the Leases and Contracts.

36. All objections to the assumption and assignment of any Lease or Contract, including without limitation any objection to the Debtors' proposed Cure Amount or the provision of adequate assurance of future performance under any Lease or Contract pursuant to section 365 of the Bankruptcy Code ("Adequate Assurance") must: (a) comply with the General Objection Procedures (as defined below); (b) identify the Lease or Contract to which the objector is party; (c) describe with particularity any cure the claimant contends is required under section 365 of the Bankruptcy Code (the "Cure Claim") and identify the basis(es) of the alleged Cure Claim under the Contract or Lease; (d) attach all documents supporting or evidencing the Cure Claim; and (e) if the response contains an objection to Adequate Assurance, state with specificity

what the objecting party believes is required to provide Adequate Assurance (collectively with the General Objection Procedures, the "Assigned Contract Objection Procedures").

37. If no objection is timely and properly filed and served in accordance with the Assigned Contract Objection Procedures, (a) the Cure Amount set forth in the Assumption and Assignment Notice shall be controlling notwithstanding anything to the contrary in any Contract or Lease or other document and the non-debtor party to the Contract or Lease shall be forever barred from asserting any other claim arising prior to the assignment against the Debtors or Purchaser as to such Contract or Lease if it is an Assigned Contract and (b) the Purchaser's promise to perform under the Contract or Lease shall be deemed Adequate Assurance under the Contract or Lease. To the extent the Debtors dispute any Cure Claim, such dispute shall be presented to the Court at the Sale Hearing, or such later date and time as the Debtors and the objector may agree or the Court may order, but such dispute shall not affect in any way the effectiveness of any assumption and assignment of a Contract or Lease.

38. While the Debtors have made a good faith effort to identify the contracts to be assumed and assigned in connection with the proposed sale, they may discover additional contracts the Debtors and the Purchaser desire to assign in connection with the Sale. Accordingly, the Debtors propose the following supplemental procedures. If at any time after the entry of the Bidding Procedures Order, whether before or after Closing, the Debtors identify additional prepetition executory contracts to be assumed and assigned to the Purchaser as Assumed and Assigned Contracts, the Debtors shall serve an supplemental Assumption and Assignment Notice by facsimile, electronic transmission, hand delivery or overnight mail on the Counterparty to each supplemental Assumed and Assigned Contract (and its attorney, if known) at the last known address available to the Debtors by no later than ten (10) calendar days before

the proposed effective date of the assignment. Each supplemental Assumption and Assignment Notice shall set forth the following information: (i) the name and address of the Counterparty, (ii) notice of the proposed effective date of the assignment (subject to the right of the Debtors and Purchaser to withdraw such request for assumption and assignment of the Assumed and Assigned Contract prior to the Closing), (iii) identification of the Assumed and Assigned Contract, (iv) the Cure Amount, if any, and (v) a description of the Purchaser, and a statement as to the ability of the Purchaser to perform the Debtors' obligations under the Assumed and Assigned Contract. The Cure Amount shall be paid as agreed by the Purchaser.

39. Unless the contract counterparty or any other entity properly files an objection to the supplemental Assumption and Assignment Notice in accordance with the General Objection Procedures (as defined below) within ten (10) calendar days of the date of the Assumption and Assignment Notice, the Debtors may assume and assign the Assumed and Assigned Contract, subject to the occurrence of the Closing, without further order or notice of hearing. If an objection is filed and served in accordance with the General Objection Procedures within ten (10) calendar days of the date of the supplemental Assumption and Assignment Notice, and the objection cannot be resolved consensually, then the Debtors will schedule a hearing to consider the objection on the next scheduled omnibus hearing date.

**E. <u>Notice</u>**

40. The Debtors propose to give notice, immediately after the entry of the Bidding Procedures Order, of the Bidding Procedures, the Form Purchase Agreement or the Stalking Horse Agreement, as applicable,[5] the Assumption and Assignment Notices, the time and place of the Auction, the Sale Hearing, and the Objection Deadline. The Debtors further propose

---

[5] If the Debtors do select a Stalking Horse Bidder, they will distribute to all known potential bidders a copy of the Stalking Horse Agreement on or before the commencement of the Auction.

to give notice of the Sale Hearing and the Objection Deadline by sending the Notice of Auction and Sale Hearing, substantially in the form attached to this Motion as **Exhibit C**, (i) all entities reasonably known to have expressed an interest in a transaction with respect to the Assets during the past nine (9) months, (ii) all taxing authorities or recording offices which have a reasonably known interest in the relief requested, (iii) the Office of the United States Trustee, (iv) counsel to the Creditors' Committee, (v) the office of the United States Attorney, (vi) all insurers, (vii) all non-debtor parties to relevant contracts or leases (executory or other), (viii) all known creditors of the Debtors, including all known persons asserting a lien, claim, encumbrance or other interest in, to or against any of the Debtors' assets, and (ix) all parties who have requested service pursuant to Bankruptcy Rule 2002.

**F. Objections**

41. All objections to the sale of the Assets, the assumption and assignment of the Assumed and Assigned Contracts, or any relief requested in the Motion other than the relief granted by this Court in the Bidding Procedures Order must be: (a) in writing; (b) signed by counsel or attested to by the objecting party; (c) in conformity with the Bankruptcy Rules and the Local Rules; (d) filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801 by no later than **4:00 p.m. (ET) on February 16, 2011** (the "General Objection Deadline"), or other applicable deadline as indicated in this Motion; and (e) served in accordance with the Local Rules so as to be received on or before the relevant objection deadline by the following (collectively, the "Objection Notice Parties"): on (i) counsel for the Debtors: Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, Wilmington, DE 19899; Attn: Derek C. Abbott, Esq; Fax: 302-425-4664; Email: dabbott@mnat.com; (ii) investment banker for the Debtors: SSG Capital Advisors, LLC, Five Tower Bridge, Suite 420, 300 Barr Harbor Drive,

West Conshohocken, PA, 19428; Attn: J. Scott Victor, Esq.; Fax:610-940-3875; Email: jsvictor@ssgca.com; (ii) counsel for the Debtors' secured lender: Greenberg Traurig, LLP, 2700 Two Commerce Square, 2001 Market Street, Philadelphia, PA 19103; Attn: Attn: Diane Vuocolo, Esq.; Fax: 215-717-5230; Email: vuocolod@gtlaw.com; (iii) counsel to the Creditors' Committee: Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, NJ 07068; Attn: Bruce D. Buechler, Esq.; Fax: 973-597-2309; Email: bbuechler@lowenstein.com and and Womble Carlyle Sandridge & Rice, PLLC, 222 Delaware Avenue, Ste. 1501, Wilmington, DE 19801; Attn: Steven K. Kortanek; Fax: 302-661-7728; Email: skortanek@wcsr.com; and (iv) counsel for the Stalking Horse Purchaser, if applicable, and (v) Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, Delaware 19801; Attn: Mark Kenney, Esq. (these procedures collectively referred to as the "General Objection Procedures"). Each objection shall state the legal and factual basis of such objection and may be orally supplemented at the relevant hearing.

## BASIS FOR RELIEF

### A. The Bidding Procedures Are Appropriate Under The Circumstances

42. A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business. 11 U.S.C. § 363. Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case. *See e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price

or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

43. The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate. The Debtors submit that the foregoing bidding procedures and the opportunity for competitive bidding embodied therein are reasonable and designed to maximize the value of the Debtors' assets and should, therefore, be approved by this Court.

44. Given the Debtors' current lack of liquidity, the Debtors believe that a prompt sale process is the best way to maximize the value of the estates' assets for the benefit of their estates, creditors and other stakeholders. The Debtors' business cannot sustain an extended postpetition sale period. The Debtors have limited cash resources and do not have additional investors willing to invest additional funds. The Debtor believe that the value of the Debtors' Assets and, therefore, the consummation of the Sale or any alternative transaction will be seriously jeopardized unless the Debtors can begin the sale process contemplated herein as expeditiously as possible.

45. Accordingly, the Debtors have concluded that: (a) a prompt sale of the Assets is the best way to maximize value for their estates, and (b) the proposed Bidding Procedures described herein are the most effective method of obtaining the highest and best offer for the Assets.

## B. <u>The Bid Protections Should Be Approved</u>[6]

46. The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy and resources necessary to submit an Initial Bid, and which the Debtors believe is fair and reasonable in view of the assets to be sold. The Proposed Sale Process and, in particular, the proposed Bid Protections, are reasonable and supported by applicable case law.

47. The use of Bid Protections such as these has become an established practice in chapter 11 asset sales involving the sale of significant assets because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. Historically, bankruptcy courts have approved bidding incentives similar to the Bid Protections solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See, e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (holding that bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Marrose Corp.,* Nos. 89 B 12171-12179 (CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1992) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"). *See also In re Integrated Resources*, 147 B.R. 650, 657-58 (S.D.N.Y. 1992).

---

6 The Bid Protections will only be utilized should a Stalking Horse Purchaser be selected by the Debtors.

48. The Third Circuit Court of Appeals has clarified the standard for determining the appropriateness of bidding incentives in the bankruptcy context. In *Calpine Corp. v. O'Brien Envtl Energy, Inc. (In re O'Brien Envtl Energy, Inc.)*, 181 F. 3d 527 (3d Cir. 1999), the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives such as the Breakup Fee must provide benefit to a debtor's estate. *Id.* at 533.

49. The *O'Brien* opinion identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537. Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*

50. The Bid Protections are consistent with the "business judgment rule" and satisfy the Third Circuit's "administrative expense" standard. At the inception of the marketing process, potential purchasers were provided with a form asset purchase agreement generated by the Debtors and will be afforded an opportunity to submit a Form Purchase Agreement marked to show changes necessary to consummate a sale which must be acceptable to the Debtors. Under the "administrative expense" standard enunciated in *O'Brien*, as well as the "sound business judgment" standard followed in other jurisdictions, the Bid Protections proposed by the

Debtor, including the Breakup Fee should be approved as fair and reasonable. The proposed Breakup Fee including any Expense Reimbursement aggregate to 3% of the proposed purchase price. The proposed Bid Protections are reasonable and generally consistent with the range of bidding protection typically approved by bankruptcy courts in this district. *See, e.g., In re Rouge Industries, Inc.*, Case No. 03-13272 (Bankr. D. Del. Dec. 3, 2003); *In re Ameriserve Food Distrib., Inc.*, Case No. 00-00358 (Bankr. D. Del. Jan 31, 2000) (court approved break up fee of 3.6% or $4 million in connection with a $110 million sale of assets); *In re Fruit of the Loom, Inc.*, Case No. 99-04497 (Bankr. D. Del. Dec. 29, 1999) (court approved break-up fee of 3.0%, or $25 million in connection with a $835 million sale of business); *In re Worldwide Direct, Inc.*, Case No. 99-108 (Bankr. D. Del. Feb. 26, 1999) (approving break-up fee of 3.1% of the proposed purchase price); *In re Montgomery Ward Holding Corp., et al.*, Case No. 97-1409 (Bankr. D. Del. June 15, 1998) (court approved break-up fee of 2.7% or $3 million in connection with $100 million sale of real estate); *In re Medlab, Inc.*, Case No. 97-1893 (Bankr. D. Del. April 28, 1999) (court approved break-up fee of 3.12% or $250,000 in connection with $8 million sale transaction).

51. Further, the Bid Protections will encouraged competitive bidding should a Stalking Horse Purchaser be selected, in that the Stalking Horse Purchaser likely will not have entered into a Stalking Horse Agreement without this bargained for protection. The Bid Protections will thus "induc[e] a bid that otherwise would not have been made and without which bidding would [be] limited." Similarly, in the event a Stalking Horse Purchaser is selected, a Stalking Horse Purchaser's offer will serve as a minimum or floor bid upon which other bidders will rely, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Finally, the existence of the Bid Protections will permit the

Debtors to insist that competing bids for the Debtors' assets be materially higher or otherwise better than that offered by a Stalking Horse Purchaser, a clear benefit to the Debtors' creditors.

52. Therefore, because the procedures and incentives included in the Sale, including the proposed Breakup Fee, are fair and reasonable, are reasonably calculated to produce the best and highest offers for the Assets and thereby confer actual benefits upon the estates herein, and are within the range of incentives customarily approved by courts, such procedures should be approved in these Chapter 11 cases.

### C. Sale Of The Assets Is A Product Of The Debtors' Reasonable Business Judgment

53. Section 363(b)(1) of the Bankruptcy Code provides: "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part: "The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

54. Virtually all courts have held that approval of a proposed sale of substantially all of the assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession. *See In re Abbotts Dairies of Pa.,* 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from

the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value."); *In re Stroud Ford, Inc.*, 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 391 (6th Cir. 1986); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

55. The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee has obtained a fair and reasonable price; and (4) good faith. *In re Titusville Country Club*, 128 B.R. at 399; *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Phoenix Steel Corp.*, 82 B.R. at 335-36; *see also Stephens Indus.*, 789 F.2d at 390; *In re Lionel Corp.*, 722 F.2d at 1071.[7]

56. Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary

---

[7] *Lionel's* "sound business purpose test" replaces an older rule which held that sales of substantially all of a debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when the assets to be sold were "wasting" or perishable. *Lionel*, 722 F.2d at 1071. The Third Circuit adopted the emergency rule in *In re Solar Mfg. Corp.*, 176 F.2d 493, 494-95 (3d Cir. 1949). While most bankruptcy courts have determined that the passage of the Bankruptcy Code and the Third Circuit's own opinion in *Abbotts Dairies* have replaced *Solar Mfg. Corp.* with the *Lionel* "sound business purpose test, *e.g.*, *Titusville*, 128 B.R. at 399; *Industrial Valley*, 77 B.R. at 21, some courts have declined to decide which test prevails. *E.g.*, *Delaware & Hudson Ry.*, 124 B.R. at 179.

course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders. *See In re Abbotts Dairies of Pa., Inc.*, 788 F.2d at 143; *In re Lionel Corp.*, 722 F.2d at 1063 (passim); *In re Equity Funding Corp. of America*, 492 F.2d 793, 794 (9th Cir. 1974) ("Other circuits have recognized the power of the bankruptcy court under Chapter X to authorize a sale of the Debtors' property under less than emergency conditions where such sale is necessary to avoid deterioration in the value of the assets").

57. The proposed procedures for sales of the Debtors' assets meet the "sound business reason" test. First, sound business purposes justify the sales. The Debtors believe that a prompt sale of the Debtors' assets by auction presents the best opportunity to realize the maximum value of the estate's assets for distribution to creditors prior to the maturity of the Debtors' postpetition financing. The Debtors further believe that the net benefit to their creditors may be adversely affected absent an immediate sale, as a result of the Debtors' inability to continue to fund operating losses. Furthermore, the Debtors continue to incur costs that, if a sale is not consummated promptly, likely will erode the proceeds that can be realized for the Debtors' creditors from a sale of the Debtors' assets, including such costs as maintenance, utility charges, employee wages, salary, benefits, and overhead. *See In re Lionel Corp.*, 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

58. The proposed procedures for sales of the Debtors' assets also meet the other factors of the "sound business reason" test. As part of this Motion, the Debtors have sought to establish procedures for notice to creditors, other prospective bidders, and other parties in interest. Under the circumstances of this case, the Debtors submit that the notice period proposed satisfies the requirements of the Bankruptcy Rules, *see* Bankruptcy Rule 2002, and

provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.

59. Finally, the proposed procedures for sales of the Debtors' assets satisfy the good faith requirement of *Abbotts Dairies*. The Debtors submit that the results of the Auction will be the product of good faith, arm's length negotiations with respect to the price and other terms of the sales of the Debtors' assets between the Debtors and highest and best bidder at the conclusion of the Auction.

60. As set forth above, the Debtors have determined, in the exercise of their sound business judgment, that the sale of the Debtors' assets to the highest and best bidder at the Auction may be appropriate and in the best interests of their estate and creditors. The sale of the Debtors' assets at the Auction will afford the Debtors' estates an opportunity to maximize the recoveries to creditors. Accordingly, the Debtors request that the Court approve the proposed procedures for sales of the Debtors' assets to the highest or otherwise best bidder at the Auction and approve the sale presented to the Court at the Sale Hearing.

### D. A Stalking Horse Purchaser Should be Granted the Protection of Bankruptcy Code Section 363(m)

61. As will be set forth in further detail at the Sale Hearing, the Debtors also maintain that should a Stalking Horse Purchaser be selected, such Stalking Horse Purchaser is entitled to the protections afforded by Bankruptcy Code section 363(m).

62. Specifically, Bankruptcy Code section 363(m) provides that:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

63. While the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986) has held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); *see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.)*, Case No. 89-3704 (KMW), 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that party, to show lack of good faith, must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

64. As the Debtors will demonstrate at the Sale Hearing should a Stalking Horse Purchaser be selected, the Debtors shall have spent a considerable amount of time and resources negotiating the Stalking Horse Agreement at arm's length, with give and take on both sides. Under these circumstances, this Court should find that the Stalking Horse Purchaser is entitled to all of the protections of Bankruptcy Code section 363(m).

### F. A Stalking Horse Agreement is Not the Subject of Collusive Bidding Under Bankruptcy Code Section 363(n)

65. As set forth above, the Debtors may select a Stalking Horse Purchaser at arm's length and in good faith regarding the sale of the Assets. Moreover, the Debtors do not believe that any such sale will be the result of collusion or other bad faith between bidders or that

the sale price under a Stalking Horse Agreement has been or will be controlled by an agreement between potential or actual bidders within the meaning of Bankruptcy Code section 363(n).

66. As the Debtors will demonstrate at the Sale Hearing should a Stalking Horse Purchaser be selected, a Stalking Horse Agreement with a Stalking Horse Purchaser will be negotiated, proposed, and entered into by the Debtors and a Stalking Horse Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor a Stalking Horse Purchaser will have engaged in any conduct that would cause or permit a Stalking Horse Agreement to be avoided under Bankruptcy Code section 363(n).

### D. Sale Of The Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman

67. Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer customer list containing personal information relating to individual persons is inconsistent with the Debtors' consumer privacy policy, section 332 governs the appointment of a consumer privacy ombudsman. 11 U.S.C. § 363(b)(1). Here, none of the Debtors' customers that are subject to the sale of the Assets are individuals, and the Debtors do not have a consumer privacy policy, so section 363(b)(1) does not apply, and a consumer privacy ombudsman is not required.

### E. Sale Of The Assets Should Be Free And Clear Of Liens

68. Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer the Debtors' assets to all Purchasers free and clear of all Liens, with such Liens to attach to the proceeds of the sale of the Debtors' assets, subject to any rights and defenses of the Debtor and other parties in interest with respect thereto. Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). *See also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that section 363(f) written in disjunctive; court may approve sale "free and clear" provided at least one of the requirements is met).

69. A sale free and clear of Liens is necessary to maximize the value of the Debtors' assets. A sale subject to Liens would result in a lower purchase price and be of substantially less benefit to the Debtors' estate. A sale free and clear of Liens is particularly appropriate under the circumstances because any Lien in, to or against the Debtors' assets that exists immediately prior to the closing of any sales will attach to the sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party in interest. The Debtors submit that holders of Liens will be adequately protected by the availability of the proceeds of the Sale to satisfy their Liens. Thus, the proposed sales satisfy sections 363(f) of the Bankruptcy Code. Moreover, any holder of a Lien that receives notice of the sales and which fails to object to the sales of the Debtors' assets free and clear of Liens should be deemed to consent to the sales, thereby complying with section 363(f)(2) of the Bankruptcy Code.

### F. Notice Of The Proposed Sale Is Reasonable Under The Circumstances

70. As noted above, the Debtors are confronted with emergency circumstances with respect to their liquidity. In order to receive the highest and best price in return for the Debtors' assets, the Debtors have filed this Motion on an expedited basis and are seeking to conduct the Auction and hold the Sale Hearing on an accelerated track. The Debtors continue to incur costs associated with preserving the value of the Debtors' assets. In order to yield the greatest possible return for the benefit of creditors and to cut off potential administrative expenses, the Debtors believe that an expedited auction and sale process is warranted and necessary.

71. Accordingly, the Debtors submit that the notice to be provided is reasonable and appropriate and will be adequate to ensure that all interested parties have the opportunity to bid for the Debtors' assets, and/or to object to the proposed sale of the Debtors' assets.

### G. The Assumption And Assignment Of Executory Contracts And Unexpired Leases Should Be Authorized

72. Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an executory contract of a debtor. This subsection provides:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B) compensates, or provides adequate

> assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1). Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if --
>
> (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

73. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown S. Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992).

74. Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

75. To the extent any defaults exist under any Assumed and Assigned Contracts, any such default will be promptly cured or adequate assurance that such default will

be cured will be provided prior to the assumption and assignment as set forth in this Motion. If necessary, the Debtors will submit facts prior to or at the Sale Hearing to show the financial credibility of the Purchaser and willingness and ability to perform under the Assumed and Assigned Contracts. The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser to provide adequate assurance of future performance under the Assumed and Assigned Contracts, as required under section 365(b)(1)(C) of the Bankruptcy Code.

76. In addition, the Debtors submit that it is an exercise of their sound business judgment to assume and assign the Assumed and Assigned Contracts to the Purchaser in connection with the consummation of the Sale, and the assumption, assignment, and sale of Assumed and Assigned Contracts is in the best interests of the Debtors, their estates, their creditors, and all parties in interest. The Assumed and Assigned Contracts being assigned to the Purchaser are an integral part of the Assets being purchased by Purchaser, and accordingly, such assumption, assignment, and sale of Assumed and Assigned Contracts are reasonable and enhance the value of the Debtors' estates. The Court should therefore authorize the Debtors to assume and assign the Assumed and Assigned Contracts as set forth herein.

### H. Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rules 6004(h) and 6006(d)

77. Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order. Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of contracts or unexpired leases are automatically stayed for fourteen days after entry of the order. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to

request a stay pending appeal before the order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h); Advisory Committee Notes to Fed. R. Bankr. P. 6006(d).

78. Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, commentators agree that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure. *See generally* 10 *Collier on Bankruptcy* ¶ 6004.09 (15th ed. 1999). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal. *Id.*

79. Because of the potentially diminishing value of the Assets, the Debtors must close this sale promptly after all closing conditions have been met or waived. Thus, waiver of any applicable stays is appropriate in this circumstance.

## NOTICE

80. Notice of this Motion has been provided to (i) the Office of the United States Trustee, (ii) counsel to the Creditors' Committee, (iii) counsel to the Debtors' secured lender, (v) the office of the United States Attorney and (vi) all parties who have requested service pursuant to Bankruptcy Rule 2002.

## NO PRIOR REQUEST

81. No prior motion for the relief requested herein has been made to this or any other Court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that this Court (i) grant this Motion and the relief requested herein; (ii) enter the proposed order attached hereto; and (iii) grant such other and further relief as it deems just and proper.

January 24, 2011
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Chad A. Fights*


Derek C. Abbott (No. 3376)
Ann C. Cordo (No. 4817)
Chad A. Fights (No. 5006)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors-in-Possession*


4032655.2